STATE OF FLORIDA, ex rel. FRED H. DAVIS, Attorney General of the State of Florida, and on behalf of EUGENE L. PEARCE, et al., and EUGENE L. PEARCE, et al., *Plaintiffs in Error*, vs. CITY OF CLEARWATER, PINELLAS COUNTY, STATE OF FLORIDA, *Defendant in Error*.

139 So. 377.

Opinion filed June 17, 1931.

Judgment reaffirmed on rehearing January 7, 1932.

*Cary D. Landis,* Attorney General, *Macfarlane, Pettingill, Macfarlane & Fowler,* for Plaintiffs in Error;

*Jones & White,* for Defendant in Error.

ADAMS, Circuit Judge.—In 1925 the Legislature by the enactment of Chapter 10394, Special Acts, extended the municipal boundaries of the City of Clearwater to include a large additional area of territory contiguous to the then established corporate limits.

On March 23rd, 1927, almost two years after the passage

of the Act, the State of Florida upon the relation of the Attorney General with certain individuals as co-relators, filed in the Circuit Court of Pinellas County an information in the nature of Quo Warranto. One of the co-relators afterward withdrew, and another died, leaving six to proceed with the suit. On April 23rd, 1928, more than a year after this information was filed, twenty-four other property owners in the annexed territory, filed their motion to be allowed to join in the suit as relators which motion was granted by the Court. In the course of the proceedings two jury trials were had, each resulting in a mistrial. After this the parties, by their attorneys, agreed to submit the matter to the Court for final determination upon the pleadings. The Court held that respondent's answer to the information as amended, set forth a full and complete defense, and thereupon rendered judgment dismissing the information. From that judgment this writ of error was taken.

In the information the relators alleged that the annexed territory was rural territory consisting of about 5625 acres of land, of which about 858 acres was in citrus groves, and the balance was wild, uncultivated, unimproved and unoccupied; that not more than sixty-one families consisting of around two hundred people resided in the territory. It is further alleged that the territory is sparsely settled, and remotely situated from the city, and has not and will not receive any benefits from the city; that it will receive no police protection, or other benefits, but will be burdened with city taxes, and that the taxes will be far greater than any benefit which can be or will be received from the city. It is further alleged that the land in citrus groves was cleared and developed solely for that purpose, and that the other land is wild and unimproved and produces but little revenue, and that the city taxes as a result of the annexation act will be such a burden as will practically

amount to a confiscation of the property. It is further alleged that the city had ample territory already within its boundaries for all its needs, and that the complainants and other residents of the annexed territory prefer to remain out of the corporate limits. It is further alleged that the annexation act violates the constitutional rights of the relators and other property owners in the territory, and that it constituted a taking of their property and rights without due process of law, and that therefore, the act was illegal, void and unconstitutional, and that the exercise of jurisdiction over the territory by the city under the authority of the act was unlawful, and that the city should be ousted therefrom.

The respondent, in due course, filed its pleas or answer by which it admitted the exercise of jurisdiction over the annexed territory, and justified it by virtue of the authority given by the annexation act, and that the act was valid and violated no Constitutional provision. The answer then set forth that soon after the passage of the Act that the City began work in providing for improvements in the territory, and that in the improvements made in the way of roads, streets, and sidewalks, and in the putting down of curbs, gutters, storm sewers, water mains, gas mains, fire hydrants, and extension of light and power lines through the territory, the city expended more than eight hundred thousand dollars. The answer alleges that the public conveniences so provided are available for use and being used by the residents of the territory. It is further alleged that all the residents of the territory use Clearwater as a trade center; that they send their children to school there; that the busses transporting the children use the streets and roads provided for the territory; that the residents use the railroads entering and serving the city for their transportation needs; that they receive their mail through the city post office; that they attend the places of amusement in the

city, and attend worship services in the churches of the city. It is further alleged that practically every home in the territory is within ten minutes drive of the business section of the city, and that the most remote and illy situate house in the territory can be reached in fifteen minutes drive. It is further alleged that the territory is serviced by telephone communication with the city, and that the fire or police department can reach any point on a paved road within six minutes after call, and can reach any point in the territory within twelve minutes after call, and that since the annexation the fire department has answered numerous calls within the territory, and saved more than one hundred thousand dollars worth of property from destruction from fire. The answer further alleges that in view of the enlargement of the corporate territory the equipment of the fire department was substantially increased so as to provide efficient service. The answer concludes by claiming that the information is not well founded.

There can be no question as to the power of the Legislature to create, extend, limit or regulate municipal boundaries, for that is granted by the Constitution, Section 8, of Article 8, which provides that "The Legislature shall have power to establish and abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time." This provision, the Court said in State vs. City of Sarasota, 109 So. 480, (text) "necessarily implies the power to establish and alter boundaries or limits of territorial jurisdiction. And even if this were not implied from such language, the Legislature would have the power anyway, the same not being denied or limited elsewhere by the Constitution." In the same case, text 481, the Court quoted with approval Section 355, Dillon on Municipal Corporations (5th Ed.) :

"Not only may the Legislature originally fix the limits of the corporation, but it may, unless specially restrained

in the constitution, subsequently annex, or authorize the annexation of, contiguous territory, and this without the consent, and even against the remonstrance, of the majority of the persons residing in the corporation or on the annexed territory. And it is no constitutional objection to the exercise of this power of compulsory annexation that the property thus brought within the corporate limits will be subject to taxation—since this is a matter which, in the absence of special constitutional restriction, belongs wholly to the Legislature to determine. The power to enlarge the Boundaries of a municipality by the annexation of contiguous territory is an incident to the legislative power to create and abolish municipalities at pleasure.''

The Court also held in MacGuyer vs. City of Tampa, 103 So. 418, that the above quoted Constitutional provision gave the Legislature ''full power'' in the formation of municipalities, and that ''The express legislative authority to abolish municipalities and prescribe their jurisdiction and powers obviously includes the power to annex territory to an existing municipality.''

By the above judicial enunciations, and others of similar character, this Court recognizes the unquestioned power of the Legislature over municipalities, but it does not hold to the view that such power is unlimited, and subject in no case to judicial review. On the contrary this Court holds to the view that when a legislative act regarding a municipality contravenes a constitutional provision, that it is subject to judicial review.

In State vs. City of Stuart, 120 So. 341 (text) the Court stated that:

''The existence of the power is freely conceded. But is that power unlimited, and the exercise of it entirely beyond judicial review in any and all cases? The weight of authority in this country seems to answer this question in the affirmative, and to hold that the legislative power in this regard is practically plenary and unlimited, in the

absence of express constitutional restriction thereof. We
have no such express restriction in our Constitution.''

In discussing in above opinion this question, Justice
Brown, by a course of reasoning, which in the humble
opinion of this writer, was based on a correct interpretation
of law as applied with due regard for the fundamentals of
the elements of common sense and principles of justice,
concluded it would be unsound to hold that the power of
the Legislature in such matters was supreme and not sub-
ject in any case to judicial review. See State vs. City of
Stuart, text 346:

> ''This theory of unlimited power in the passage of
> statutes establishing or extending municipal boundaries,
> if correct, would make it an exception to the general
> rule, and that, too, without giving any sufficient reason
> for such exception. The general rule is that the Legis-
> lature is supreme in the legislative field, which is the
> most powerful branch of the government, SO LONG AS
> IT DOES NOT VIOLATE ANY OF THE PROVIS-
> IONS OF ORGANIC LAW.''
> ''There is to our minds no justifiable exception of any
> class of legislation from this all pervasive and funda-
> mental principle.''

In referring to the disposition of ''many able Courts''
to hold that in fixing municipal boundaries the legislative
power is supreme and not subject to judicial review, it was
stated, that in all probability such courts proceeded on the
theory that the Legislature alone has the power to ''draw
a boundary line'' or to provide ways and means for the
drawing. After an exhaustive discussion of the question,
which fully evidenced the extensive study he had given it,
he announced his conclusion, which was concurred in by the
entire Court. See State vs. City of Stuart, supra, text 346:

> ''It thus appears to us that the contention that the
> power of the Legislature in this particular respect is
> unlimited and beyond judicial review, unless there is
> some specific provision of the Constitution expressly
> regulating or restraining the action of the Legislature

in the exercise of the particular power, is unsound. Regardless of the absence of such a specific provision, while great latitude must be allowed the Legislature in such matters, yet, if the Boundary Extension Act constitutes a palpably arbitrary, unnecessary and flagrant invasion of personal and property rights clearly guaranteed by other provisions of the Constitution, such action is as much subject to judicial review as any other class of legislation. It may be true that only the Legislature can "draw the line" but, if the line as drawn be unconstitutional, the courts can set it aside, leaving it to the Legislature to draw another and valid line if it wills. The difficulty of judicial adjudication of such class of cases, and the many and various factors which enter into the determination of the constitutionality of legislation —such for instance as the difficulty of judicially reviewing the exercise of the undoubted power of the Legislature in establishing municipal boundaries to accommodate not only the present but reasonably anticipated future needs of a growing municipality—must not deter the courts from enforcing the Constitution in those cases, RARE THOUGH THEY MAY BE, where it is, CLEARLY AND BEYOND ALL REASONABLE DOUBT, VIOLATED AND DISREGARDED."

(Italics ours).

There was the usual and customary amount of procedural skirmishing between counsel for the parties by way of demurrers, motions and what not, first one and then the other being "hindered, embarrassed and delayed" by some pleading filed by the opposite side. But when all the procedural underbrush is cleared away, it is plainly apparent that the real crux of the case is whether or not under the law and the circumstances of the case, the statute in question here is constitutional or not.

Considering the statute in conformity with the expressed views of this Court, the question to be decided is, whether the act of the Legislature in the passage of Chapter 10394, Special Acts of 1925, constitutes a "palpably arbitrary, unnecessary and flagrant invasion of the personal and prop-

erty rights'' of the complainants, ''clearly guaranteed by other provisions of the Constitution,'' and, whether or not, the Act ''clearly and beyond all reasonable doubt violates and disregards'' their constitutional rights. In State vs. City of Stuart, supra, text 351, the Court quoted with approval from Sedgwick on State and Constitutional Law:

"The extension of the limits of a city or town, so as to include its actual enlargement, as manifested by houses and population, is to be deemed a legitimate exercise of the legislative power. An indefinite or unreasonable extension, so as to embrace lands and farms at a distance from the local government, does not rest upon the same authority. And although it may be a delicate, as well as a difficult duty, for the judiciary to interpose, we have no doubt but strictly there are limits beyond which the legislative cannot go. It is not every case of injustice—which may be reached; and it is not every case which will authorize a judicial inquiry into the minute operation of laws imposing taxes, or defining boundaries of local jurisdictions? The extension of the limits of the local authority, may in some cases be greater than is necessary to include the adjacent population, or territory—without a case being presented in which the courts would be called upon to apply a nice and exact scrutiny as to its practical operation. It must be a case of flagrant injustice and palpable wrong amounting to a taking of private property, without such compensation in return as the taxpayer is at liberty to consider a fair equivalent for the tax."

It is charged by the complainants that a large portion of the annexed territory is open land and on that very question in State vs. City of Sarasota, 109 So. 481, (text) a case involving annexation, this Court said:

"The conclusion is inevitable that the mere fact that municipal boundaries are extended by direct legislative enactment, so as to include a considerable area of uninhabited and unimproved rural land, does not per se render the act unconstitutional."

Therefore the Court having held that the mere fact that

annexed territory is rural land does not of itself render the act unconstitutional, it is necessary to consider the situation which existed in 1925 when this annexation act was passed by the Legislature.

Everybody who was in Florida in 1925 knows that the State went through the experience of a most amazing period of dealing and speculation in real estate. What everybody knows, the Courts are presumed to know, and of such matters may take judicial cognizance. St. Lucie County Bank & Trust Co. vs. Aylin, et al., 114 So. 438. During that time every hamlet, town and city was a-quiver with excitement. Real estate offices sprang up like mushrooms. Gigantic real estate developments costing millions of dollars were under way. Abstract offices worked night and day to furnish abstracts of title to property owners and purchasers. The offices of the Clerks of the Circuit Court were literally swamped with instruments relating to real estate for record. Land prices soared to almost unbelievable heights. Corporate limits were enlarged as towns and cities visioned themselves developing in the great centers of commerce and population. It was a time of unparalleled prosperity. All sorts of building both public and private was in course of construction. Public improvements of every kind were being projected. The City of Clearwater is situated in a section of the State where the hectic flush of this speculative and development period reached a high temperature. Like scores of other towns and cities it was thought necessary to enlarge the municipal boundaries to take care of the great influx of new population which it was then thought was sure to come and settle to live in its midst. Under these conditions this annexation act was passed and went into effect and operation in the territory. In securing the passage of this Act the City of Clearwater simply followed a course that was being generally observed at the time by many other cities and towns,

in what they believed to be necessary development of their respective municipalities. The course might not have been wise, and we can see, from the present viewpoint that it was very unwise, but with the wisdom of legislation the courts cannot be concerned, so long as it does not trespass upon the organic law.

> "The reasonableness or justice of a deliberate act of the Legislature, the wisdom or folly thereof, the policy or motives prompting it, so long as the act does not contravene some portion of the organic law, are all matters for legislative consideration and are not subject to judicial control. The courts are bound to uphold a statute, unless it is clearly made to appear beyond a reasonable doubt that it is unconstitutional." State vs. City of Sarasota, 109 So. 473.

The relators raise the question that the annexed territory is not contiguous to the original corporate limits, because the annexation of previous territory, to which the present annexed territory is contiguous, was illegal and unconstitutional. It is not necessary to discuss that at any length, for the reason that the Legislature, by Chapter 10391, Special Acts of 1925, validated in all respects the annexation complained against.

The Act in question here was passed and went into effect without objection. Every property owner in the territory had full knowledge of the public improvements provided therein, and for which the city expended more than eight hundred thousand dollars. The improvements as made are available for use, and being used by the residents of the territory. The police and fire departments of the city is at the service of the territory, and it is shown without contradiction, that the fire department has answered numerous calls within the territory, and performed a valuable service for its residents, by saving more than a hundred thousand dollars worth of property from destruction by fire. Eight of the co-relators waited until almost two years

after the passage of the Act, and until much of the improvement had been done, and the money expended.therefor, before they complained of the unconstitutionality of the legislation. Twenty-four of the complainants waited until a year after this suit was instituted, and almost three years after the passage of the Act to voice their complaint, by asking to be allowed to join as co-relators herein. In State vs. City of Stuart, 120 So. 335, the Court said "There is in this case no question of estoppel by acquiescence for any considerable period of time." But in this case it is entirely different, for it is clear that the complainants sat on the stool of do-nothing for a long period of time, and watched extensive public improvements being made and large sums expended therefor, without complaint. They received and accepted valuable services from the city government. There is no question here, but that there was entire and complete acquiescence for a long period of time, by one group for two years, and the other for three years.

In considering this case, we have done so with a real sympathetic feeling for the co-relators, for the reason that we fully appreciate the situation and what brought it about, for we personally experienced a severe scorching by the boom fever, and still feel the effect of it. We have studied diligently many times, and wished more often, that we could find something unconstitutional about the cause of it, but without success. And in this case we are compelled to conclude that there is nothing in the law, or the circumstances as shown by the record, to make it clearly appear beyond a reasonable doubt that the statute involved here is unconstitutional. On the contrary it does not appear to violate any constitutional provision, or to invade any organic right. Therefore, it is our opinion that the judgment of the lower Court dismissing the Information in the nature

of Quo Warranto was correct, and that the judgment should be, and the same is hereby affirmed.

WHITFIELD AND TERRELL, J.J., concur.

BUFORD, C.J., concurs in the conclusion.

BROWN, J., concurs specially.

ELLIS, J., dissents.

DAVIS, J., disqualified.

BROWN, J., concurring specially.—This is a very close and difficult case, but on the whole I concur with Judge Adams that we cannot say that the trial judge clearly erred in his conclusion that the territory in question was within the range of at least some substantial municipal benefits. However, I am inclined to differ with the interesting and able opinion of Judge Adams on one point. I do not think that enough time had elapsed to create an estoppel. If the facts had shown that the territory was at the time of annexation entirely beyond the range of present or contemplated municipal benefits, and not necessary to the present or reasonably anticipated growth of the city, as was shown in the Stuart case, I do not think that the time elapsing from the statutory annexation to the filing of the information or amended information in this case would have been sufficient to operate as a waiver of estoppel, of the right to attack the same.

ELLIS, J., dissenting.—The parties elected to present in this case the issue of estoppel against co-relators to contest the validity of the City's extension of limits by Chapter 10394 Acts 1925. The pleas of respondent are mainly if not completely directed to that end and the replications of co-relators met the city on that issue. The judgment of the court below necessarily rests upon his opinion as to the sufficiency of the pleas of estoppel as the allegations of the petition accepted as true are sufficient standing alone to invalidate the act Chap. 10394 supra. I think the pleas of estoppel are insufficient.

ON REHEARING.

Order filed January 7, 1932.

PER CURIAM.—A petition for rehearing having been granted in this cause and the Court having pursuant thereto further considered the record herein upon briefs and argument of counsel for the respective parties it is now considered ordered and adjudged by the Court that the judgment heretofore entered by this Court affirming the judgment of the Circuit Court for Pinellas County should be and the same is hereby affirmed.

BUFORD, C.J., AND WHITFIELD AND TERRELL, J.J., AND ADAMS, Circuit Judge, concur.

DAVIS, J., disqualified.

---

Opinion filed March 9, 1933.

ADAMS, Circuit Judge.—This matter was originally determined in favor of the Defendant in Error. A rehearing was, on motion duly made, granted, and the original decision affirmed. This action transpired just four or five days, before the expiration of the 1931 June Term of this Court. After the expiration of this term, and a short time after the beginning of the 1932 January Term of this Court, to-wit: on February 17th, which was more than a month after the beginning of the Term, the Court of its own motion entered an order vacating the judgment which affirmed the original judgment as aforesaid. The Defendant in Error, by its attorneys, have moved the Court to vacate and set aside its order vacating and setting aside its judgment as aforesaid, and it is urged that the Court is now without power or jurisdiction to consider the cause further, for the reason that the judgment was made and entered during the 1931 June Term, and that at the time of making the order complained of, that term had expired, and, therefore, the term having expired, and no motion for rehearing having been filed, the Court had lost jurisdiction of the

case, and also the power to act further therein, other than to forward the mandate of the lower Court.

At the beginning of my consideration of this involved question, I was strongly of the opinion that the Court had lost its jurisdiction and power to act, for the reason that the term at which the judgment was rendered had expired, and all time for motions for rehearing had expired, and none had been filed, and the new term had begun. However, it appears that the mandate has never been transmitted in the lower court. After a study of this situation I have concluded that until the mandate is transmitted, even though it may be delayed, that the lower court is without jurisdiction of the cause, and can in no-wise act therein, and that under such circumstances the cause remains within the jurisdiction of the appellate court. There can be no twilight zone in jurisdiction nor vacuum in its application. It is either effective full force or not at all. Therefore, as I see it, there can be no question that the Pinellas County Circuit Court could not act, nor have jurisdiction of the case until the mandate was transmitted, and that not having been done, the jurisdiction of the case remained in the Supreme Court of Florida. For the reasons stated I conclude the Court had authority and jurisdiction to make the order, and that the motion of appellee. to vacate and set aside the same should be overruled and denied.

WHITFIELD, TERRELL AND BUFORD, J.J., concur.

BROWN, J., dissents.

DAVIS, C.J., disqualified.

---

Opinion filed March 9, 1933.

ADAMS, Circuit Judge.—In this cause the judgment of the lower court was affirmed on June 17, 1931, Motion for rehearing was duly filed and on January 7, 1932, the judgment of this Court as aforesaid was reaffirmed. On February 17th, 1932, the Court *ex mero motu* entered an order

granting a further rehearing. Counsel for the parties presented oral arguments at this hearing, it being contended by appellee ·that the Court was without jurisdiction to further consider the case, other than order the mandate transmitted to the lower court. This contention was not considered as being well founded for the reason that the Court was of the opinion that the Supreme Court retained full jurisdiction of the cause until the mandate was transmitted to the lower court. That question being disposed of the Court has further considered the case on its merits and it is the opinion of the Court that the judgment rendered herein on June 17, 1931, should be, and the same is hereby reaffirmed.

WHITFIELD, TERRELL AND BUFORD, J.J., concur.

BROWN, J., dissents.

DAVIS, C.J., disqualified.

BROWN, J., dissenting.—Believing as I do that this Court lost jurisdiction of this case for all purposes, at the end of the June Term, 1931, which ended Jan. 11th, 1932, except for the purpose of enforcing its former judgment of June 17, 1931, reaffirmed on rehearing on Jan. 7th, 1932, by sending down its mandate, which it had become its duty to do, I do not think we have jurisdiction to take any further action, either by way of changing or affirming our former judgment on the merits.

WHITFIELD, J., concurring.—The Supreme Court acquires appellate jurisdiction of a cause by due issuance of a writ of error by the Clerk of the Supreme Court or ·by the Clerk of the lower court in cases where writs of error are applicable, or by the filing of an entry of appeal in the lower court in cases where an appeal is applicable. The due *recording* of a writ of error or of an entry of appeal in the circuit court in civil causes, gives the Supreme Court jurisdiction of the defendants in error or of the appellees, who are duly made parties of the

writ of error or entry of appeal. The Supreme Court loses its appellate jurisdiction and the trial court regains its jurisdiction of the cause by the filing of the mandate of the appellate court in the lower court (Brown v. State, 29 Fla. 494, 11 So. 181; Merchants' Nat. Bank of Jacksonville v. Grunthal, 39 Fla. 388, 22 So. 685; State ex rel. v. Robles, filed October 10, 1932) ; unless the mandate may be legally recalled. Lovett v. State, 29 Fla. 384, 11 So. 176, 16 L. R. A. 313; Chapman v. St. Stephen's P. E. Church, 105 Fla. 683, 138 So. 630; 4 C. J. 208; 3 Cyc. 478. The mandate may be withheld by the appellate court. J. T. & K. W. Ry. Co. v. Adams, 28 Fla. 631, 10 So. 465, 14 L. R. A. 533.

Where on appeal or writ of error, the Supreme Court affirms or reverses a judgment, decree or order, such court does not lose jurisdiction of the cause until the mandate of the Supreme Court is duly remitted to, and received in the office of the clerk of the lower court. If a term of the Supreme Court expires after an appellate cause is adjudicated and before the mandate is duly transmitted to the lower court, the Appellate Court retains jurisdiction of the cause until its mandate therein is duly filed in the lower court. Appellate causes in which the mandate of the Supreme Court has not been issued are among the causes continued into the next term by the general order of continuance made at the end of each term of the Supreme Court.

Mandates of the Supreme Court do not, except on special order, issue until the time for filing petitions for rehearing under the rule has expired, and this is the rule where a term of the court ends after the judgment or decree on appeal has been adjudicated and before the time for filing petitions for rehearing in a cause has expired. The issue of mandates is not controlled by the beginning or the ending of a term of the appellate court unless otherwise so

provided or ordered. The time allowed by the rule for filing petitions for rehearing is not affected by the beginning or ending of a term of the appellate court unless so prescribed by law or ordered by the court in due course.

In this case the judgment on writ of error was on rehearing reaffirmed just before the end of a term of the appellate court. In view of matters presented in other pending similar cases, this court, *sua sponte*, after the expiration of the term in which the judgment was reaffirmed, directed the clerk not to issue the mandate in this cause until specially directed to do so. The withholding of the mandate retained jurisdiction of the cause until the mandate of this court is duly transmitted to the lower court.