(William J. AMMONS, Jr.), Barbara H. Dobson, Charles A. Harrison, Vann M. Hughes, and Freddie A. Mitchell, Jr., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DADE CITY, FLORIDA, William F. Brewton, Mayor of Dade City, Florida, Lawrence Puckett, Agnes Lamb, William Dennis, Rev. D.L. Williams, City Commissioners of Dade City, Florida, their successors and agents in their official capacities,* Defendants.

Civ. A. No. 81–171 Civ–T–BK.

United States District Court, M.D. Florida, Tampa Division.

Sept. 21, 1984.

---

\* Recently elected public official defendants have been substituted for the individual public officials defendants sued at the institution of the lawsuit.

David M. Lipman, Lipman & Weisberg, Miami, Fla., for plaintiffs.

George C. Dayton, P.A., Charlie Luckie, Jr., Dade City, Fla., for defendants.

## OPINION AND ORDER

KRENTZMAN, Senior District Judge.

### PROCEDURAL BACKGROUND

1. In this action filed on February 23, 1981, plaintiffs seek injunctive and declaratory relief to restrain defendants from providing municipal services in a racially discriminatory manner. At trial, plaintiffs, a class of black citizens, maintained that they have been unlawfully denied their right to equal municipal services, including: street paving, street resurfacing and maintenance, and storm water drainage facilities in violation of their rights under the Thirteenth and Fourteenth Amendments to the United States Constitution.[1]

2. The complaint charged that the (a) City of Dade City, Florida, (b) its Mayor and (c) four City Commissioners in their official capacity, deprived black citizens of equal municipal services and requested that alleged qualitative and quantitative disparities between services provided to black and white citizens be eliminated.

3. Five black citizens—William J. Ammons, Jr.,[2] Barbara H. Dobson, Charles A. Harrison, Vann M. Hughes, and Freddie A. Mitchell, Jr., are the named plaintiffs, black residents of the City of Dade City, Florida, who represent plaintiffs' class. Filed as a class action, this Court certified the class pursuant to Rule 23(b)(2) to include:

> All black residents of Dade City, Florida, who have been affected by the Defendants' alleged policy or practice of racial discrimination in the providing or financing of municipal services. (Order of May 28, 1982)

4. From the initiation of this lawsuit in February, 1981, until the completion of trial on July 15, 1983, defendants have resisted and contested various phases of the litigation.[3]

Defendants objected to many of plaintiffs' pretrial discovery efforts. See, (1)

---

1. At the time the action was filed, plaintiffs sought relief with respect to the following services: (a) paving and maintaining streets, (b) provision of sewerage facilities, (c) provision of water, (d) provision of storm water drainage facilities, (e) fire protection, and (f) street lighting. See, Complaint, ¶ 8. Plaintiffs also sought relief under the Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and the State and Local Assistance Act of 1971, as amended in 1976, 31 U.S.C. § 1242.

At the beginning of the trial, plaintiffs indicated to the Court that they were limiting their claims to the provision of street paving, street resurfacing and maintenance and to storm water drainage facilities and, insofar as liability, to the constitutionally based claims.

Additionally, plaintiffs informed the Court that they intended to present evidence that that filing of the lawsuit acted as a "catalyst" toward obtaining other service improvements in the black community, the relief plaintiffs had sought when they initially filed this lawsuit.

2. On July 8, 1983, this Court granted plaintiffs' motion to dismiss Ammons as a named plaintiff. The other named plaintiffs, Barbara H. Dobson, Charles A. Harrison, Vann M. Hughes and Freddie A. Mitchell, Jr., continue as named plaintiffs and continue to adequately represent the class.

3. On March 20, 1981 defendants filed a motion to dismiss contending that plaintiffs' complaint: (i) failed to set forth sufficient facts upon which the Court could grant relief; (ii) failed to state a claim upon which relief could be granted; (iii) failed to provide sufficient information relating to Federal Revenue Sharing expenditures; (iv) failed to set forth facts with sufficient specificity so that defendants could file an answer; (v) failed to demonstrate that the named plaintiffs properly represented the interests of their proposed class members; and (vi) failed to allege sufficient facts demonstrating a racial inequality. All of defendants' arguments were denied by this Court's order of November 6, 1981.

Additionally, the City raised various affirmative defenses and a jury trial request in its answer (filed November 25, 1981). These matters were the subject of plaintiffs' motion to strike and/or dismiss (filed December 21, 1981). The Court, in its order of June 1, 1982, granted plaintiffs' request to strike the following affirmative defenses: (i) failure of plaintiffs to exhaust administrative remedies under Title VII (second defense) (page 5, order of June 1, 1982); (ii) failure of plaintiffs to file written claims before Dade City or relevant state agency (fourth and fifth defense) (Ibid); and (iii) a statute of limitations bar (sixth defense) (Ibid). In addition, defendants request for a jury trial was denied (page 5–6, Ibid).

defendants' objections to plaintiffs' request for admissions of fact (first set) (filed June 26, 1981) denied by this Court's orders of August 7, 1981 and August 12, 1981; (2) defendants' objections to plaintiffs' request for admissions of fact (second set) (filed July 27, 1981) denied by orders of August 7, 1981 and August 12, 1981 and order of November 6, 1981 compelling identical discovery; (3) defendants' objections to interrogatories (first and second set) (filed May 11, 1981) denied by order of June 3, 1981; and (4) defendants' objections to interrogatories (fourth and fifth set) (filed February 17, 1982) granted by order of June 29, 1982.

5. I personally considered and presided at all pretrial status hearings, discovery hearings, and pretrial conferences. A three-day trial to the Court at which the parties were fully heard was conducted. The parties requested and were granted leave to file post trial memoranda and proposed findings. I have reviewed and considered my trial notes, a two-volume transcript of the testimony of defendants' witnesses, furnished by defendants, and both plaintiffs' and defendants' post trial memoranda and proposed findings.

Being advised and upon consideration, I make the following findings of fact and conclusions of law pursuant to Rule 52(a) Federal Rules of Civil Procedure.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

6. Defendant William Brewton is the Mayor of Dade City, Florida; defendants Lawrence Puckett, Agnes Lamb, William Dennis and Rev. D.L. Williams are the present members of the City Commission. These defendants have responsibility for the administration of the affairs of Dade City, including the provision, allocation and financing of all municipal facilities and services.

---

**4.** Referring to a portion of town or a segment of society as being "on the other side of the tracks" has for too long been a familiar expression to most Americans. Such a phrase immediately conjures up an area characterized by poor housing, overcrowded conditions and, in short, overall deterioration.

7. The City of Dade City was incorporated on January 15, 1889 (Plfs.Ex. 24, Int. No. 22). Dade City's 1980 population was 4,923, of which 1,158 was black or approximately 23.5% of the City. (Testimony of F. Cooper) (Source: Pg. 11–19, Table 15, 1980, Census of Population, General Population Characteristics—Florida, Publication No. PC 80–1–B11); (Defs.Ex. 6). Dade City, Florida is approximately 45 miles northwest of Tampa. The City is bisected by a major U.S. highway, U.S. 301/98, and by a major railroad line. Atlantic Coast Line Railroad tracks are still in use (Plfs.Ex. 20); (Def.Ex. 5). The principal black residential community is located literally adjoining the Atlantic Coast Line Railroad tracks. (Plfs.Ex. 20); (Testimony of F. Cooper).

8. The City's black residential community is primarily located "on the other side of the railroad tracks." [4] The black community situated within each of the railroad tracks forms almost a perfect triangle in the southeastern region of the City. It is bounded on the east by the City limits, south by Coleman Avenue, and on the north by East Main Avenue. (Plfs.Ex. 20) (Map); (Testimony of F. Cooper).

The other adjoining area of the City's black residential community is situated just west of the railroad tracks bounded on the east by the railroad tracks, U.S. Highway 301 and 6th Street, on the north by Gaddis Street, on the west by 12th and 10th Streets, and by E. Robinson Avenue to the south. (Plfs.Ex. 20) (Map); (Testimony of F. Cooper).

9. There are 434 households in the City's black residential community within the boundaries previously described. (Plfs.Ex. 3, Tab 1). This community is composed of 1049 black citizens. (Plfs.Ex. 29) which represents 90.5% of all black citizens residing in Dade City. (Plfs.Ex. 29); (Defs.Ex. 6 and 7). [5] Additionally, of

---

*Hawkins v. Town of Shaw, Mississippi,* 437 F.2d 1286, 1291 (5th Cir.1971).

**5.** This conclusion was derived from Plaintiffs' Exhibit No. 29, a statistical summary admitted into evidence pursuant to Rule 1006 F.R.E. Plaintiffs superimposed census block data reflecting number of black persons existing in

those black persons situated outside of the designated black community (109 or 9.5% of the remaining black citizens), most (91 or 7.8% of those blacks) are located in integrated areas just outside the border of the black residential boundary area. (Plfs.Ex. 29).

Thus, the residential segregation of the races in Dade City—in the eastern quadrant of the City bordering on the railroad tracks—is clear.[6]

10. The City of Dade City provides, maintains and improves certain municipal services and facilities for its residents. The City has undertaken the construction and maintenance of: 1) street paving, 2) street resurfacing and maintenance, and 3) storm water drainage facilities.

11. Construction and maintenance of these services has been financed from a variety of private, city and federal funding sources. (Plfs.Ex. 12, Tab 3, No. 5). Street paving in the City has sometimes been accomplished through a special assessment program. (Plfs.Ex. 12, Tab 3, No. 5). In other instances, the City has paved streets with general revenues and with federal funds. (Plfs.Ex. 12, Tab 3, No. 5). In those instances when a street was paved under an assessment program, there exists a pattern of forgiving or cancelling the assessment debt. (Plfs.Ex. 23); (Testimony of J. Feltman).

Maintenance and resurfacing of streets is financed entirely through City funds (Plfs.Ex. 12, Tab 3, No. 5) (Testimony of L. Smith) and has never been assessed to property owners. Similarly, storm water drainage improvements are financed through City revenues. (Plfs.Ex. 12, Tab 3, No. 5).

12. In support of their claims that because of their race plaintiffs and the class they represent had been unconstitutionally denied their right to equal municipal services, plaintiffs offered and the Court received as relevant, evidence as to the early development of Dade City and the history of its treatment of black citizens. See, paragraphs 13–24 (post).

13. Following its incorporation in 1889, the City of Dade City, Florida, developed, as did many other small southern rural cities. (Testimony of Shofner)[7] In the

various blocks (Def.Ex. 5 and 6) upon their maps (Plfs.Ex. 20, 21) in calculating that 1049 (90.5%) of the total 1158 black citizens live in the black designated area depicted in plaintiffs' graphic exhibits (Plfs.Ex. 20, 21) and various statistical summaries. (Plfs.Ex. 3) (Street Paving Conclusions); (Plfs.Ex. 4) (Storm Water Drainage Facilities); (Plfs.Ex. 7) (Street Resurfacing).

6. Defendants contested this boundary description, maintaining that the "predominantly black community" of the City should include all areas of the City included within Census Block districts which reflect a minimum of ten percent (10%) black residents. See, Defs.Ex. 5. Defendants' vision of the black community would thus include all the area described by plaintiffs plus all additional parts of the City encompassing census block districts with a minimum of ten percent black residents.

The dispute between the parties as to the geographical boundaries of the black community thus involves a definitional distinction between the parties. Plaintiffs submitted evidence—in addition to their requests for admissions of fact and defendants' responses (Plfs.Ex. 2) summarized in the Inventory of Municipal Services (Plfts.Ex. 1) which depicted the black community in graphic form in maps (Plfs.Ex. 20, 21)—based upon 1980 census data, discussed in ¶ 10, supra, and at note 4, supra, indicating that 90.5% of all blacks in the City live in the area described by plaintiffs' as the black community. (Plfs.Ex. 20, 21) (Maps). Moreover, a remaining 7.8% of blacks live in the adjacent integrated areas just outside of this defined black community.

Defendants in contrast provide no explanation, provide no accepted legal standard, no planning standard, no engineering standard, nor even a census bureau standard (Testimony of M.F. Mullins) which would support their assertion that an area should be considered "predominantly black" when a minimum of only 10% of the residents on those blocks are black.

The Court finds that plaintiffs' description of the geographic area constituting the "black community" is accurate.

7. Except where otherwise specifically noted, the findings as to history of development of municipal services in Dade City, Florida are based on the expert testimony of Florida historian, Dr. Jerrell Shofner, Professor of History and Chairman of the History Department of the University of Central Florida, and various referenced court exhibits.

Dr. Shofner is a former president of the Florida Historical Society.

early 1900's, the period referred to as the "Progressive Era," smaller cities throughout the South were beginning to provide various municipal services within their jurisdictions.

14. As in other southern states, progressivism in Florida was for the most part "for whites only." For example, as the state expanded its school system, the gap between white and black schools widened. Prior to 1900, one of the few public services provided by either state or local government in Florida were the public schools. During this period, state law mandated that for every dollar spent on educating a black child, three and one-half dollars would have to be spent on educating a white child.

Reforms were enacted alongside a growing list of laws which, between 1895 and 1915, provided legal backing to the customary segregation of the races in all aspects of Florida society. In the matter of political reforms, advocates of primary elections wanted an increased voice for "the people" in choosing their leaders, but to liberals as well as conservatives of the 1890's, this meant white people.

15. These laws which contributed to segregation of the races were enacted by the state and by local governments throughout Florida. In Dade City, on January 22, 1914, the City passed an ordinance making it illegal for black people to "intermingle" with white people. (Plfs.Ex. 5) This ordinance was not repealed until February 11, 1975, (*Ibid.* Fact No. 112) established a framework for the development of race relations in the City.

 16. Following the end of World War I, in the 1920's, there existed a general movement in the South to modernize. For many cities modernization took the form of instituting large scale municipal improvement projects. In 1925, like other cities, Dade City instituted the largest street paving program in the history of the City. (Plfs.Ex. 6, Dade City Banner, August 25, 1925)[8] The project, which involved the paving of approximately 4½ miles of streets was financed by the sale of municipal bonds, a common practice during that period.

17. At the state level and in other partisan political races, the "white primary" effectively prevented blacks from voting in partisan elections. The "white primary" was the law in Florida until invalidated by the Florida Supreme Court in *Davis v. State ex rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (1945). In Dade City, the city commissioners were elected on a nonpartisan basis, which did not provide for any primary elections. However, on November 17, 1931, the City enacted an ordinance requiring payment of a poll tax as a prerequisite to vote in City elections. (Plfs.Ex. 5, Tab 5). The poll tax requirement was diligently enforced by City officials. (Plfs.Ex. 6, Dade City Banner, September 15, 1933, November 10, 1933). The poll tax, which like the "white primary" acted as an effective device to prevent blacks from voting. Only one black was ever elected to the city commission, O.K. Mickens in 1974. (Plfs.Ex. 12, Tab 2, Int. No. 4).[9]

---

**8.** This Court has received into evidence exhibits offered by plaintiffs which contain collections of newspaper articles from the Dade City Banner. Plaintiffs' Exhibit 6 includes newspaper articles which are self-authenticating. F.R.E. 902(6).

Plaintiffs argued that the articles were admissible over any hearsay objection based on the ancient documents exception to the hearsay rule. F.R.E. 803(16). The Court agrees. The Advisory Committee notes to Rule 803(16) specifically embrace the inclusion of 20 year old newspaper articles under the ancient doctrine exception by citing *Dallas County v. Commercial Union Insurance Co.,* 286 F.2d 388 (5th Cir.1961) (upholding admissibility of 58 year old newspaper articles to illustrate the scope of the ancient doctrine exception). Other courts have similar-

ly relied upon newspaper accounts in interpreting history. *See, e.g., Bell v. Combined Registry Company,* 397 F.Supp. 1241, 1246, 1247 (N.D.Ill. 1975) *aff'd* 536 F.2d 164 (7th Cir.1976) (newspaper articles received into evidence under 803(16)).

Those articles, which are less than twenty years old, while not "ancient documents" are admissible and probative to show how the events of the day were being recorded. *See, McMillan v. Escambia County, Florida,* 638 F.2d 1239, 1248 (5th Cir.1981) (probative 1957 editorial).

**9.** Upon O.K. Mickens' death, his widow, Christine Mickens, was appointed to fill his unexpired term. Upon the death of Mrs. Mickens,

18. In 1935, the Dade City Commission decided to foreclose upon property in the black residential area of the City. The black community at that time as reported in the local newspaper, the Dade City Banner, was referred to as the "negroes quarters."

19. In 1935, the City, through a Works Progress Administration Project (WPA), paved and opened additional streets through the City. (Plfs.Ex. 6, Dade City Banner, August 30, 1935, October 18, 1935, November 1, 1935).

20. Beginning in 1948, the City played a more active role in developing a segregated black community by specifically setting aside on the "other side of the tracks," land for a negro subdivision. The city commission minutes reflect that the "Mickens-Harper" subdivision was treated by the City as a negro subdivision. (Defs.Ex. 19), (Plfs.Ex. 5, Facts 25 and 26). In 1948, the City set aside additional land for negroes to live east of the Mickens-Harper subdivision. (Defs.Ex. 19), (Plfs.Ex. 6, Dade City Banner, November 25, 1949), (Plfs.Ex. 5, Fact 28). By setting aside land for negroes to live east of the railroad tracks, the City further separated the races in Dade City.

21. The 1950's signaled a change in race relations throughout the United States. Fair Employment practices legislation was discussed in Washington, D.C. and President Truman issued a series of executive orders prohibiting certain forms of employment discrimination.

22. Excerpts from the official city commission minutes books, during the 1950's reveal a pattern of blacks in Dade City requesting improvements in various city services. See, e.g., (Plfs.Ex. 5, Fact No. 31) (Requests for sand surface on unpaved streets; paving of streets, recreation center and water main); (Plfs.Ex. 5, Fact 35) (Request for paving of street); (Plfs.Ex. 5, Fact 62) (Request for improvements for Mickens-Harper Athletic Field); (Plfs.Ex. 5, Fact 87) (Request for additional fire hydrants in Mickens-Harper Subdivision). On September 22, 1979, "several negro men" presented a petition to the city commission requesting "that the City make some effort to have some kind of drainage installed to take care of the water which settles in low places in the negro section of town." (Ex. 5, Fact 30). The City's response was to "take up the matter under consideration." (Ex. 5, Fact 30).

23. On March 15, 1951, the Negro Civic Committee of Dade City met with the city commission to present complaints as to various municipal services. Specifically, the Negro Civic Committee complained of the lack of paved streets in the "negro section" and of serious drainage problems making the streets impassable. The Negro Civic Committee specifically requested that:

1. The commission include in their paving budget some streets in the negro section; and

2. That sand be put on the clay surfaced streets to make them passable during the rainy season.

24. On November 5, 1951, the city commission made it clear that while setting aside additional lands for negro housing in the Mickens-Harper subdivision, the land could not be subdivided until proper grading and filling had been accomplished and that the "City does not agree to perform such grading and filling at any specific or specified time." (Plfs.Ex. 5, Fact 38).

In contrast, just four months after the city commission refused to perform grading and filling in the black Mickens-Harper subdivisions, the City was actively sharing expenses for paving streets in a new white subdivision. (Plfs.Ex. 6, Dade City Banner, March 28, 1952).

25. The different treatment given the separate black and white residential communities of Dade City by the city commission was further evidenced in defendants' implementation of the City's assessment program for the paving of its streets.

26. On August 16, 1951, the Negro Civic Committee met with the city commission to discuss the paving of certain streets in the black Mickens-Harper subdivision. The Negro Civic Committee was told "that they

Reverend D.L. Williams, a black, was appointed to fill her unexpired term.

would have to pay in advance for any paving done" which the commission stated "had been the rule of the City's in paving their street." (Def.Ex. 19); (Plfs.Ex. 5, Fact 35).

27. The evidence at trial showed that many city streets were never assessed at all and that often the assessments were never collected, *see*, *infra*, paragraphs 56–59, and that at no time were assessed property owners required to pay for the cost of street paving in advance.[10] James Feltman, a certified public accountant testified that he had reviewed the record, ranging from 1920 to 1982, reflecting every assessment levied by the City for street paving and there is no indication that property owners were ever required to pay in advance.

28. Additionally, just some eight months after the Negro Civil Committee was told that it would have to pay in advance to have their streets paved, the City agreed to share the expense for street paving in a proposed white development on the opposite side of the tracks from the black Mickens-Harper subdivision. (Plfs.Ex. 6, Dade City Star Banner, March 28, 1952).

29. In addition to requests for street paving, the black community also sought other types of municipal service improvements. In August, 1956, a delegation of black citizens from the Dade City Negro Civic Committee requested the City to provide a paved sidewalk to the negro school for school children to walk (Plfs.Ex. 6, Dade City Star Banner, August 2, 1956) and also blacks complained of an inadequate sewer line to the "negro high school." (Plfs.Ex. 6, Dade City Star Banner, May 12, 1955).

30. Other requests for services by blacks and the results are indicated by the following:

| Date | Request by Black Citizens | City's Response |
|---|---|---|
| 1. March, 1955 (Plfs. Ex. 6, Dade City Star Banner, March 31, 1955) | Delegation of black citizens meet with City Commission to request hiring of negro policeman for negro sections of the City. | Request denied. |
| 2. January, 1956 (Plfs. Ex. 6, Dade City Star Banner, January 12, 1956) | Two blacks, on behalf of Negro Civic Club, request Commissioners to appoint a negro policeman for duty in the negro section of the City. | Request not granted. |
| 3. July 30, 1956 (Plfs. Ex. 5, Fact 54) (Plfs. Ex. 6, Dade City Banner, August 2, 1956) | A delegation of the Negro Civil Committee requested a full time negro policeman to patrol the negro sections of the City. | Commission took matter under consideration. |
| 4. October 3, 1957 (Plfs. Ex. 5, Fact 62) | A delegation from the Negro Civic Committee asked the following question to the Commission: Will the Commission hire a "negro policeman"? | Commission told blacks "It would be impossible to hire a negro policeman.". |

---

**10.** Defendants contend that streets were sometimes paid for in full under an assessment plan by property owners prior to their paving. Lindy Smith, city clerk and finance director of the City from 1957 to the present, testified that property owners on "four or five streets" during his employment at the City had voluntarily paid their assessment liens by one lump sum initial payment at the beginning of the project but that he recalled no instance wherein a property owner had been required to pay their assessment in advance as occurred to those black citizens in 1951.

| | | |
|---|---|---|
| 5. September 3, 1958 (Plfs. Ex. 5, Fact 64) | Dade City Civic Committee requested a "negro police officer". | Commission denied request after it was decided that sufficient funds were not available at this time to employ a negro police officer. |
| 6. January 7, 1959 (Plfs. Ex. 5, Fact 67) | Negro Civic Committee requested Commission for a negro policeman. | Commission asked Committee to submit 3 or 4 names for the position. |
| 7. October 7, 1959 (Plfs. Ex. 5, Fact 71) | | The Negro Civic Committee was told "that a study had been made and it was found that there was no sufficient need for a full time negro police officer". |
| 8. April, 1981 (Plfs. Ex. 5, Tab 4, Minutes April, 1981, Commission, p. 464) | Commissioner Mickens stated that the following observations have been made by the black community: Would like to see some black secretaries and/or black police officers in our community. | Commission agreed to review requests and come back with recommendations. |

31. In 1954, the United States Supreme Court decided *Brown v. Board of Education.* In Dade City, an organization called the White Citizens Council, Inc. was formed with the purpose to "make the continuance of segregation by all legal and peaceful means." (Plfs.Ex. 6, Dade City Banner, April 19, 1956).

32. Despite their lack of success, black citizens in Dade City continued to press their demands for equal treatment in the provision of city services throughout the 1960's. In February, 1960, representatives from the Dade City Negro Civic Association appeared before the Commission to renew its previous unsuccessful request for a sidewalk leading to the black school. On April 5, 1962, black citizens complained to the City about the lack of fire hydrants in black Mickens-Harper subdivision. The commission was told there "was only one fire hydrant for the entire subdivision." (Plfs.Ex. 5, Fact 87).

On April 8, 1969, representatives of the local chapter of the NAACP complained to the city commission that the City's recreational director, Mr. Lamar Watson, developed rules based on race, and harassed and threatened young people. The City's response was direct:

"Commissioner Abraham stated that he was most happy to make the motion that this Commission will go on record as supporting Mr. Lamar Watson (the recreation director) 100% in favor of his activities." (Plfs.Ex. 5, Fact 100).

33. On February 11, 1975, at the request of the Citizens' Advisory Committee, a bi-racial committee, the commission initiated the process to repeal the following ordinances: (1) Section 4–10, which prohibits the sale of alcoholic beverages in any establishment catering to both white and colored patrons; and (2) Section 15–4, which prohibits the co-mingling of races at religious, fraternal and social meetings. (Plfs.Ex. 5, Fact 112).

34. All present key City positions are held by whites, e.g., city manager, finance director, city engineer, public works superintendent, police chief, fire chief. (Plfs.Ex. 15–A).

None of the members of the zoning board of adjustments identified in the period between 1966–1981 were black. (Plfs.Ex. 15, Tab 1), (Testimony of F. Mitchell); there were no black citizens appointed to the police officers retirement board between 1956–1983. (Plfs.Ex. 15, Tab 3), (Testimony of F. Mitchell); no blacks were members of the firemen's relief and pension board (1947–1983) (Plfs.Ex. 15, Tab 4) (Testimony of F. Mitchell); and no blacks were members of the parks and recreation board (1959, 1963) (Plfs.Ex. 15, Tab 5) (Testimony of F. Mitchell), board of plumbing examiners (1956) (*Ibid*), electrical board of examiners (1956) (*Ibid*), and planning board (1963) (*Ibid*).

35. Present City employment reflects a pattern of racial discrimination. Not one black earns a salary greater than $12,900 per year. Black employees are concentrated in labor and/or other menial positions. Of the 12 blacks in the City's work force of 84 employees, 8 (67%) are concentrated in "service/maintenance" positions. (Ex. 15–A, Tab 3).

SALARY OF DADE CITY EMPLOYEES BY RACE

| Thousands | White | Black | Total |
|---|---|---|---|
| 25.0 – 32.9 | 3 (100%) | 0 ( 0%) | 3 |
| 20.0 – 24.9 | 4 (100%) | 0 ( 0%) | 4 |
| 16.0 – 19.9 | 5 (100%) | 0 ( 0%) | 5 |
| 13.0 – 15.9 | 16 (100%) | 0 ( 0%) | 16 |
| 10.0 – 12.9 | 30 ( 85%) | 5 (15%) | 35 |
| 6.0 – 9.9 | 14 ( 66.7%) | 7 (33.3%) | 21 |
| Sub-Total | 72 ( 85.7%) | 12 | 84 |

Source: Plfs. Ex. 15–A, Tab 3
(EEO–4 Report Submitted by City on January 18, 1983)

EMPLOYMENT DATA

TABLE I

| | White | Black | Total |
|---|---|---|---|
| Officials/ Administrators | 6 (100%) | 0 ( 0%) | 6 |
| Professionals | 5 (100%) | 0 ( 0%) | 5 |
| Technicians | 10 (100%) | 0 ( 0%) | 10 |
| Protective Services | 19 ( 95%) | 1 ( 5%) | 20 |
| Paraprofessionals | 5 (100%) | 0 ( 0%) | 5 |
| Sub-Total | 45 ( 95%) | 1 ( 3%) | 46 |

Source: Plfs. Ex. 15–A, Tab 1
(EEO–4 Report Submitted by City on January 18, 1983)

36. Upon consideration of plaintiffs' claims of racial discrimination in the provision of street paving, street resurfacing and maintenance, and storm water drainage, the Court has reviewed and analyzed the factual evidence relating to the provision of these services. At the outset, it should be noted that most of the initial factual disputes between the parties as to these services has been resolved through extensive utilization of requests for admissions of fact. (Plfs.Ex. 2). When necessary, the Court has resolved those factual conflicts which remain contested.

37. The Court finds a significant and unconstitutional disparity between the number and quality of paved streets in Dade City, Florida adjacent to or serving housing and other facilities occupied by

black persons and those serving white persons. Facilities in the black community are unequal to those that exist in the white community.[11]

The following pattern of racial discrimination, based upon disparities in street paving services exist at the time of the commencement of the trial:

RESIDENTIAL STREET FOOTAGE

[July 13, 1983]

| CURRENT STREET CONDITION [Footage] | | | |
|---|---|---|---|
| Race of Neighborhood | Paved (%) | Unpaved (%) | Total (100%) |
| White | 116,647 (81.9%) | 25,749 (18.1%) | 142,396 |
| Black | 20,490 (70.5%) | 8,567 (29.5%) | 29,057 |

(Plfs. Ex. 3, Table I)

RESIDENCES ON UNPAVED STREETS

[July 13, 1983]

| CURRENT STREET CONDITION [Households] | | | |
|---|---|---|---|
| Race of Neighborhood | Paved (%) | Unpaved (%) | Total (100%) |
| White | 1,127 (86.2%) | 181 (13.8%) | 1,308 |
| Black | 299 (68.9%) | 135 (31.1%) | 434 |

(Plfs. Ex. 3, Table II)

38. Finding of disparity in street paving is derived from the inventory of municipal services (Plfs.Ex. 1), the plaintiffs' request for admissions of fact (First Set) and defendants' responses (Plfs.Ex. 2), and the testimony of plaintiffs' consulting professional planner, Fred Cooper, as summarized in the inventory of municipal services. (Plfs.Ex. 1).[12]

39. More significantly than these minor factual differences, defendants have raised

11. At the time of the filing of the lawsuit in February, 1981, the existing disparity in street paving service between black and white communities was even greater than on July 13, 1983, at the commencement of trial.

As more fully discussed in part herein, a significant street paving program took place which resulted in paving 3,805 feet of streets in the City's black community on which 54 black households resided. (Plfs.Ex. 8).

Discrimination in street paving at the time of the filing of the lawsuit in February, 1981 is as follows:

| STREET CONDITION AT TIME OF FILING SUIT [Households] | | | |
|---|---|---|---|
| Race of Neighborhood | Paved (%) | Unpaved (%) | Total (100%) |
| White | 1,073 (82%) | 235 (18%) | 1,308 |
| Black | 227 (67.8%) | 108 (33.2%) | 335 |

(Plfs. Ex. 3, Table IV)

12. Inventory of Municipal conditions (Plfs.Ex. 1) contain the following data—agreed to by the parties in those instances where no asterisk exists—through the Plaintiffs' Request for Admissions of Fact and Defendants' Responses (Plfs.Ex. 2):

four distinct defenses to the findings of racial discrimination in the street paving service.[13]

40. The Court will review the remaining three defenses raised by the City. First, defendants argue that streets in the black community included here were annexed into the City in 1982 and should not be included in any disparity analysis. Second, defendants argue that state and/or county roads located within the residential black and white residential areas of the City should be omitted from any disparity analysis. Third, defendants argue that if any disparity did exist, it resulted from a non-discriminatory uniform special assessment process.

41. Defendants argue that certain black residential streets which were annexed into the City in 1982 should not be included in any disparity analysis. (Defs.Ex. 30).[14]

42. Significantly, the area of the black community which was annexed—Larkins Subdivision (Victory and Larkins Sunnybrook Addition Subdivision)—is bordered by the railroad tracks on the west, on the north by Roosevelt Avenue, on the east by the City limits, and on the south by Sumner Lake Road. This area of the black community, although not "officially" within the City limits of Dade City, prior to 1982, and for years previously, functioned as an integral part of the City.

43. Uncontroverted testimony by plaintiffs' planning expert Fred Cooper indicated that the area annexed in 1982 was developed at least thirty years prior to 1982 and that many of the houses may have even been older. Mr. Cooper described the area as indistinguishable from the rest of

| Reference Fact No. | Street Name | Location | Race of Resident | Number of Households | Footage | Street Condition | Drainage |
|---|---|---|---|---|---|---|---|

The most significant factual dispute between the parties stemmed from the parties' different characterization of whether a street segment was residential or commercial. The parties differed over the commercial residential characterization of 27 street segments. Plaintiffs generally categorized street segments which had households on the street or the street was in a residential area. See, (Plfs.Ex. 1, Fact Nos. 29, 41, 52, 53, 65, 93, 123, 141, 142, 297, 304, 305, 311, 312, 358, 359, 425, X, EE, 462, 470, 475; 799). (Testimony of F. Cooper).

The parties also disagreed on the racial designation of the residents of a street in only eight street segments. (Plfs.Ex. 1, Fact Nos. 10, 11, 81, 102, 147, 160, 161 and 250); the inclusion on former state and county roads (Plfs.Ex. 1, Fact Nos. 257, 258 and 259), and characterization of whether a street was a city street number (Plfs.Ex. 1, Fact Nos. 10, 11, 62, 65 and 462); footage of the street (Plfs.Ex. 1, Nos. AA), and type of drainage device (Plfs.Ex. 1, Fact Nos. 53, 54, 62, and 337).

The various conflicts were resolved by testimony of Plaintiffs' witnesses. Fred Mitchell, a named plaintiff and life-long resident of Dade City resolved the racial desegregation conflicts. (Plfs.Ex. 26). This testimony was never challenged nor rebutted. Likewise, Plaintiffs' expert City Planner resolved the remaining conflicts without challenge or rebuttal, with the exception of the City's conceptual—as distinguished from factual—challenge to the inclusion of

state/county streets in the total residential disparity analysis.

13. In addition to the City's defenses discussed herein, the City argued that for purposes of a disparity analysis, the Court should consider an area "predominantly black" if a minimum of ten percent of the residents in a specific area were black.

This of course had the result of including many streets occupied solely by white citizens in the City's "predominantly black" category solely because they were situated within a census block with a minimum of 10% black residents.

The Court has previously rejected this argument. See, supra, F.N. 6.

14. These streets are: (1) Fact C, Canal (1/3 way north of Roosevelt to Roosevelt); (2) Fact D, Roosevelt (Canal to Cochran); (3) Fact E, Roosevelt (Canal to RR Street); (4) Fact F, RR Street (Roosevelt to Hampton St.); (5) Fact G, RR Street (Hampton to Tuskegee); (6) Fact H, RR Street (Tuskegee—south to City Limits); (7) Fact I, Hampton (RR Street to Wilson); (8) Fact J, Tuskegee (RR Street to Sumner); (9) Fact K, Tuskegee (Sumner to Wilson); (10) Fact L, Sumner (Tuskegee to Wilson); (11) Fact M, Sumner (Wilson to Cochran); (12) Fact N, Cochran (Sumner to Roosevelt); (13) Fact O, Roosevelt (Cochran to Canal); (14) Fact P, Wilson (Roosevelt to Hampton); (15) Fact Q, Wilson (Hampton to Tuskegee); (16) Fact R, Wilson (Tuskegee to Sumner). (Plfs.Ex. 1).

the City in that it is essentially engulfed by and contiguous with the City limits and because the residents commonly utilize services (shopping, etc.) in the City.

44. The Larkins Subdivision area annexed in 1982 is urban in character in that it is densely populated. That area contains approximately 270 individuals, of which almost all are black. (Defs.Ex. 6).

45. The Court finds that the relationship between the area annexed in 1982 and the City is sufficient to constitute part of the black community for the purposes of a present disparity analysis. This conclusion is reinforced in context of the City's past history of encouraging and indeed sharing in the expenses for paving of new white residential subdivisions, *supra*. A history of actively annexing other residential areas within the present white community, (Defs.Ex. 2) (map showing annexation since 1959), and the fact that there is no evidence that the City took any steps to initiate the annexation process for Larkins despite the fact that that area was so "susceptible to municipal benefits" stemming from the "relationship between the community and the land in question." *State v. City of Oakland Park*, 42 So.2d 270, 272 (Fla.1949) (concurring, Barnes J.) [15]

46. Defendants argue that certain streets should be omitted from any disparity analysis because, although they are City residential streets, they are owned by the state or county. Defendants' argument has no impact in the black area of Dade City since there are no streets in that community serving as residential streets.[16] In the City's white area these streets provide an important role in providing paved streets to the white residential areas.[17]

47. Defendants argument is rejected for several reasons. First, the black citizens of Dade City have been denied the equal benefits of the paved and serviced state/county owned streets as a direct re-

---

**15.** Interestingly, even if those streets with the 1982 annexed area were eliminated from the overall disparity analysis, a statistically significant disparity would still exist between the races in street paving services:

| | CURRENT STREET CONDITION WITHOUT 1982 ANNEXATION (Households) | | |
|---|---|---|---|
| Race of Neighborhood | Fronting Paved Streets (%) | Fronting Unpaved Streets (%) | Total (100%) |
| White | 1,127 (86.2%) | 181 (13.8%) | 1,308 |
| Black | 259 (77.3%) | 76 (22.7%) | 335 |

This has been calculated by merely adding the households in the annexed area, *see, supra,* ¶ 41, n. 13, and subtracting those totals from the present overall disparity analysis. *See, supra,* ¶ 37.

**16.** Defendants' responses to requests for admissions of fact indicate no streets in the black residential community which are indicated as state and/or county owned.

Defendants Exhibit No. 3 (map) did indicate that one relatively small street segment in the black community, Tuskegee (RR to Wilson) was a state and/or county owned street (Testimony of M.F. Mullins). Regardless of this discrepancy, the contrast between the existence of 30 paved streets in the white residential community that are state/county owned and none or one in the black community is clear.

**17.** The following is a list of those state and county streets in the white areas:

(1) Meridian (10th to 11th); (2) Meridian (11th to 12th); (3) Meridian (12th to 13th); (4) Meridian (13th to 14th); (5) Suwanee (21st to 22nd); (6) Suwanee (22nd to 23rd); (7) Suwanee (23rd to limits); (8) Meridian (14th to 15th); (9) Meridian (15th to 16th); (10) Meridian (16th to 17th); (11) 7th (Florida to Coleman); (12) 21st (Coleman to Palm); (13) 21st (Palm to Florida); (14) 21st (Florida to Avondale); (15) 21st (Avondale to McMinn); (16) 21st (Church to McMinn); (17) 21st (Church to Meridian); (18) 21st (Meridian to Suwanee); (19) 21st (Suwanee to Virginia); (20) 21st (Virginia to Missouri); (21) River Road (Lakeland to Johns); (22) 21st (Missouri to Jefferson); (23) 21st (Jefferson to Main); (24) 21st (Main to Davis); (25) 21st (Davis to North); (26) 21st (North to Jean); (27) 21st (Jean to North limits); (28) 7th (Coleman to Southview); (29) 7th (Southview to Bougainvillea); (30) Gaddis (10th to Lakeland).

sult of the City's racially discriminatory practices which forced blacks to live on the "other side of the tracks," an area geographically set apart from the white residential neighborhoods which enjoy the benefits of the state/county owned paved streets. This occurred through a series of City actions—beginning with the 1914 ordinance prohibiting the intermingling of the races and continuing through the City's actions in the post-World War II era in developing the racially segregated Mickens-Harper Subdivision. The City took a series of specifically designed actions to force black citizens to live in a segregated area separate and apart from the City's white citizens. Moreover, these streets, as even recognized by the City (Plfs. Ex. 2) (defendants' responses to requests for admissions of fact), are residential streets and function just as those owned by the City. To not calculate the state/county owned residential streets in the disparity analysis would reward the City for its racially segregated practices.

48. As a result of the City's residential policies and practices which forced blacks to live apart from whites, blacks do not live in areas of the City which enjoy the benefits of state and county residential streets as to whites.

49. Second, the City has been intimately involved with the maintenance of these state/county owned streets which it requests the Court to omit from the disparity analysis. Lindy Smith, the city clerk of Dade City since 1957, testified that over the years the City has consistently requested the state and county to maintain these streets.

50. For example, on January 11, 1952, the city commission voted to request the state road department to pave Lock Street and 21st Street from Meridian to Lock Street, which are streets all located in the white residential areas of the City. (Plfs. Ex. 5, Fact 39), (Plfs. Ex. 20). In 1953, the City urged the state road department to resurface the following streets in the white residential community. (Plfs. Ex. 5, Fact 45):

| | | White Residential | | |
|---|---|---|---|---|
| Fact No. | Street | From | To | Length in Feet Paved |
| 96 | Meridian | 10th | 11th | 225 |
| 97 | Meridian | 11th | 12th | 236 |
| 98 | Meridian | 12th | 13th | 236 |
| 99 | Meridian | 13th | 14th | 236 |
| 247 | Meridian | 14th | 15th | 698 |
| 248 | Meridian | 15th | 16th | 158 |
| 249 | Meridian | 16th | 17th | 304 |
| 250 | Meridian | 17th | 21st | 1,148 |
| | | | Total | 3,241 |

51. Most recently, on January 4, 1983, the City continued its involvement with the maintenance of these streets by seeking to have the following streets in the City's white residential area resurfaced:

| | | White Residential | | |
|---|---|---|---|---|
| Fact No. | Street | From | To | Length in Feet Paved |
| 1) 181 | 17th | Marshall | Clinton | 382 |
| 2) 183 | 17th | Marshall | Clinton | 90 |
| 3) 214 | Suwanee | 21st | 22nd | 405 |
| 4) 215 | Suwanee | 22nd | 23rd | 472 |
| 5) 217 | Suwanee | 23rd | city limits | 235 |
| | | | Total | 1584 |

Thus, the Court finds that these streets should be calculated in a disparity analysis between the black and white areas of the City.

52. The defendants argue, citing *Hadnott v. City of Prattville*, 309 F.Supp. 967 (M.D.Ala.1970) as authority, that the City is not constitutionally responsible for any

disparity which may exist in street paving between the City's black and white residential neighborhoods since paving is accomplished through a non-discriminatory racially neutral special assessment program.[18]

The City's assessment defense is not controlled by *Hadnott, supra,* since the facts presented in that case so significantly and materially differ from this action that the *Hadnott* -principle has no application.

53. Evidence surrounding the City's assessment practices was presented through the testimony of plaintiffs' expert certified public accountant, James Feltman. Mr. Feltman conducted a study and analysis of all assessment lien records in the custody of Dade City. These records, stipulated to by the parties as constituting all lien records reflecting all assessment liens from the City's initial incorporation in 1889 through the present, including the following information: (i) name of property owner, (ii) address, (iii) date of assessment lien, (iv) total lien obligation, (v) payment schedule of lien obligation, and (vi) history of actual payment performance. (Plfs. Ex. 27).

In addition to an analysis of these records, Feltman corroborated his study by cross-referencing that data with city commission meeting records (Plfs. Ex. 5) and newspaper clippings (Plfs. Ex. 6) which related relevant events surrounding the City's assessment practice.

Noteworthy is that Feltman's findings (Plfs. Ex. 23) (Summary of Assessments and Collection Information), (Plfs. Ex. 28) (Compilation of Total Non-Assessed Paved Streets), (Plfs. Ex. 21) (Map: Non-Assessed Paved Streets), were not rebutted by any testimony of the City except for city clerk finance director Lindy Smith's testimony that of all assessments ever charged by the City, totalling $661,807.94 (Plfs. Ex. 23) (Summary of Assessment and Collection Information), the second column total of $15,464.57 reflecting Book 7, 1957–1982 "Adjustments-amount forgiven" might be in error—or at least subject to different interpretation—since $10,283.10 of that lien amount had been sold in the form of a certificate note by the City to a bank. Even here however, Smith had no knowledge whether those $10,283.10 of liens sold in the form of a certificate to the bank ever in fact were ultimately paid by the property owner.

Smith, and for that matter the City's only other challenge to the Feltman testimony, concerned a $4,641.31 assessment against Seaboard Railroad which, under cross-examination, Smith noted had been in fact cancelled.

Other than these two minor matters, Feltman's testimony stands unrebutted.

54. A great portion, indeed one-half (50.3%) of all residential paved streets were either never assessed at all or the assessment was adjusted in such a manner that at least 90% of the outstanding lien obligation was cancelled. (Plfs. Ex. 28).[19] (Plfs. Ex. 21) (Map: Non-Assessed Paved Streets).

As to the other category—the forgiving or cancellation of assessment liens—Feltman's study revealed that just a little more than one-half (56.25%) of all assessment

---

**18.** A consistent and racially neutral assessment program—where property owners *always pay a uniform* share of the total cost of a street paving project—as existed in *Hadnott, supra,* would fall outside of a constitutional challenge based upon race considerations simply because any disparity which might exist between the races would be a function of the financial ability of property owners to pay for the paving and not race. Differences based upon wealth or financial considerations in such a context are not constitutionally prohibitive. *See, e.g., San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Disparities based upon wealth differences not a suspect classification triggering "close scrutiny" analysis of an equal protection violation.)

**19.** Feltman's conclusion revealed:

| | | |
|---|---|---|
| Total Paved Residential Street Footage | 137,137 | (100%) |
| Total Non-Assessed Paved Street Footage or Street Footage Representing at Least 90% of Outstanding Obligation Cancelled | 69,093 | (50.3%) |
| Subtotal: | | |
| 1. Non-Assessed Paved Streets | 42,445 | (30.9%) |
| 2. 90% of Outstanding Obligation Cancelled | 26,648 | (19.4%) |

This statistical information (Plfs.Ex. 28) was graphically depicted in a map, verified as to its accuracy by Feltman, (Plfs.Ex. 21), illustrating all residential street footage which: (1) was never assessed or (2) at least 90% of the outstanding obligation was cancelled.

liens charged to property owners were in fact ever collected by the City from its incorporation through trial:

| | | |
|---|---|---|
| Total Assessment Lien | $661,807.94 | (100%) |
| Amount of Assessments Which were Documented to Have Been Paid | $372,287.87 | (56.25%) |
| Amount of Assessments Cancelled and/or No Documentation of Payment | $289,520.07 | (43.75%) |
| (Testimony of J. Feltman), | (Plfs. Ex. 23) | |

55. In sum, the evidence is clear that (1) no consistent policy to even assess residential street paving has existed and (2) when assessments were obligated, there has been no uniform collection process of those liens.

56. Second, the City's assessment practice itself is infected with racial discrimination. While Dade City's stated policy—confirmed by the Feltman study and finance director, Lindy Smith—was to permit assessment lien obligations to be paid over a ten year period when blacks attempted to obtain street paving in the Mickens-Harper Subdivision, a major black subdivision which had been designed by the City for segregated residential development (Def. Ex. 19), (Plfs. Ex. 5, Fact 35), their delegation (negro civic committee) was told by the City "that they would have to pay in advance for any paving done." (*Ibid*). This is in direct contrast, and deviates from the City's stated policy of permitting lien payments over a ten year period. The requirement for blacks to pay in advance is even more discriminatory given the City's practice of not requiring major portions of assessments to have to be paid at all through its cancellation policies. *See, supra*, ¶ 27–28, page 18. Significantly, no other instance of a requirement to "pay in advance" was ever imposed upon any white citizen of Dade City. (Testimony J. Feltman), (Testimony L. Feltman), (Testimony L. Smith).

57. Plaintiffs submitted extensive evidence reflecting disparities between the races in the provision of street resurfacing. *See*, (Plfs. Ex. 7). The City-provided service—street maintenance and resurfacing—is financed entirely from City funds (Plfs. Ex. 12, Interrogatory 5), (Testimony L. Smith) and no portion has ever been assessed to the property owner.

Plaintiffs compiled an exhibit reflecting resurfacing performed by the City from 1956 to the present. Plaintiffs' evidence was based upon the inventory of municipal services (Plfs. Ex. 1), plaintiffs' request for admission of fact and defendants' response (Plfs. Ex. 2), city commission minutes (Plfs. Ex. 5), and newspaper articles of the Dade City Banner (Plfs. Ex. 6).

58. Defendants, through testimony of Lindy Smith, pointed out several errors in plaintiffs' resurfacing data. The Court, having reviewed the City's testimony, and having resolved the parties disagreements, finds with regard to providing resurfacing to the black and white residential communities in Dade City as follows:

| CONCLUSIONS—STREET RESURFACING PRIOR TO FILING OF LAWSUIT [20] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **I. STREET RESURFACING PROGRAM (FOOTAGE)** 1956–1980 | | | | **II. STREET RESURFACING PROGRAM (FINANCES)** 1956–1980 | | | |
| | WHITE RESIDENTIAL | BLACK RESIDENTIAL | TOTAL | | WHITE RESIDENTIAL | BLACK RESIDENTIAL | TOTAL |
| 1956 | 4795 (100%) | 0 ( 0%) | 4795 | 1956 | $ 4,075.85 (100%) | 0 ( 0%) | $ 4,075.85 |
| 1961 | 5502 (100%) | 0 ( 0%) | 5502 | 1962 | $13,503.40 (100%) | 0 ( 0%) | $13,503.40 |
| 1962 | 3155 (100%) | 0 ( 0%) | 3155 | 1964 | $ 7,300.00 (100%) | 0 ( 0%) | $ 7,300.00 |
| 1964 | 2500 (100%) | 0 ( 0%) | 2500 | 1966 | $21,139.61 ( 88%) | $2,626.95 ( 12%) | $23,766.56 |
| 1965 | 1020 (100%) | 0 ( 0%) | 1020 | 1977 | $12,746.23 ( 69%) | $5,609.15 ( 31%) | $18,355.38 |
| 1966 | 10800 ( 82%) | 2250 ( 18%) | 13050 | 1978 | $ 6,733.30 (87.4%) | $ 968.75 (12.6%) | $ 7,702.05 |
| 1967 | 3495 (100%) | 0 ( 0%) | 3495 | 1980 | $39,895.00 ( 93%) | $2,556.00 ( 7%) | $42,451.00 |
| 1975 | 2000 ( 90%) | 225 ( 10%) | 2225 | | | | |
| 1976 | 2060 (100%) | 0 ( 0%) | 2060 | Totals | $105,393.39 ( 90%) | $11,760.85 ( 10%) | $117,154.24 |
| 1977 | 4660 ( 74%) | 1620 ( 26%) | 6280 | | | | |
| 1978 | 2112 (77.2%) | 625 (22.8%) | 2737 | | | | |
| 1980 | 6885 ( 92%) | 545 ( 8%) | 7430 | | | | |
| Totals | 48,984 (90.3%) | 5,265 (9.7%) | 54,249 | | | | |

[Source: Plfs. Ex. 7 with various modifications explained in Footnote 20].

**20.** In resolving the parties conflicting evidence, the Court initially commenced its analysis by reviewing plaintiffs' Exhibit 7. It then reviewed each assertion made by defendants as to any inaccuracy or perceived inaccuracy in the data. The contrast between plaintiffs' original Exhibit 7 and the Court's findings is illustrated by the following charts indicating the Court's modifications to Exhibit 7.

[Original Data-Proposed Modifications Shown in Underlining]

CONCLUSIONS—STREET RESURFACING PRIOR TO FILING OF LAWSUIT

I. STREET RESURFACING PROGRAM (FOOTAGE)
1953–1980

| | WHITE RESIDENTIAL | BLACK RESIDENTIAL | TOTAL |
|---|---|---|---|
| 1953 | 3241 (100%) | 0 ( 0%) | 3241 |
| 1958 | 4945 (100%) | 0 ( 0%) | 4945 |
| 1961 | 5502 (100%) | 0 ( 0%) | 5502 |
| 1962 | 3155 (100%) | 0 ( 0%) | 3155 |
| 1964 | 2500 (100%) | 0 ( 0%) | 2500 |
| 1965 | 1020 (100%) | 0 ( 0%) | 1020 |
| 1966 | 10800 ( 82%) | 2250 ( 18%) | 13050 |
| 1967 | 3495 (100%) | 0 ( 0%) | 3495 |
| 1975 | 2000 (100%) | 0 ( 0%) | 2000 |
| 1976 | 2060 (100%) | 0 ( 0%) | 2060 |
| 1977 | 4660 ( 74%) | 1620 ( 26%) | 6280 |
| 1978 | 3622 (100%) | 0 ( 0%) | 3622 |
| 1980 | 6885 ( 92%) | 545 ( 8%) | 7430 |
| Totals | 53,885 (92%) | 4,415 ( 8%) | 58,300 |

II. STREET RESURFACING PROGRAM (FINANCES)
1953–1980

| | WHITE RESIDENTIAL | BLACK RESIDENTIAL | TOTAL |
|---|---|---|---|
| 1953 | $ 4,203.25 (100%) | 0 ( 0%) | $ 4,203.25 |
| 1962 | $13,503.40 (100%) | 0 ( 0%) | $13,503.40 |
| 1964 | $ 7,300.00 (100%) | 0 ( 0%) | $ 7,300.00 |
| 1966 | $21,139.61 ( 88%) | $2,626.95 ( 12%) | $23,766.56 |
| 1977 | $12,746.23 ( 69%) | $5,609.15 ( 31%) | $18,355.38 |
| 1978 | $12,643.30 (100%) | 0 ( 0%) | $12,643.30 |
| 1980 | $39,895.00 ( 93%) | $2,556.00 ( 7%) | $42,451.00 |
| Totals | $111,430.79 ( 92%) | $10,792.10 ( 8%) | $122,222.89 |

[Modified Data—Modifications Shown in Underlining]

CONCLUSIONS—STREET RESURFACING PRIOR TO FILING OF LAWSUIT

I. STREET RESURFACING PROGRAM (FOOTAGE)
1956–1980

| | WHITE RESIDENTIAL | BLACK RESIDENTIAL | TOTAL |
|---|---|---|---|
| 1956 | 4795 (100%) | 0 ( 0%) | 4795 |
| 1961 | 5502 (100%) | 0 ( 0%) | 5502 |
| 1962 | 3155 (100%) | 0 ( 0%) | 3155 |
| 1964 | 2500 (100%) | 0 ( 0%) | 2500 |
| 1965 | 1020 (100%) | 0 ( 0%) | 1020 |
| 1966 | 10800 ( 82%) | 2250 ( 18%) | 13050 |
| 1967 | 3495 (100%) | 0 ( 0%) | 3495 |
| 1975 | 2000 ( 90%) | 225 ( 10%) | 2225 |
| 1976 | 2060 (100%) | 0 ( 0%) | 2060 |
| 1977 | 4660 ( 74%) | 1620 ( 26%) | 6280 |
| 1978 | 2112 (77.2%) | 625 (22.8%) | 2737 |
| 1980 | 6885 ( 92%) | 545 ( 8%) | 7430 |
| Totals | 48,984 (90.3%) | 5,265 (9.7%) | 54,249 |

II. STREET RESURFACING PROGRAM (FINANCES)
1956–1980

| | WHITE RESIDENTIAL | BLACK RESIDENTIAL | TOTAL |
|---|---|---|---|
| 1956 | $ 4,075.85 (100%) | 0 ( 0%) | $ 4,075.85 |
| 1962 | $13,503.40 (100%) | 0 ( 0%) | $13,503.40 |
| 1964 | $ 7,300.00 (100%) | 0 ( 0%) | $ 7,300.00 |
| 1966 | $21,139.61 ( 88%) | $2,626.95 ( 12%) | $23,766.56 |
| 1977 | $12,746.23 ( 69%) | $5,609.15 ( 31%) | $18,355.38 |
| 1978 | $ 6,733.30 (87.4%) | $ 968.75 (12.6%) | $ 7,702.05 |
| 1980 | $39,895.00 ( 93%) | $2,556.00 ( 7%) | $42,451.00 |
| Totals | $105,393.39 ( 90%) | $11,760.85 ( 10%) | $117,154.24 |

59. In sum, a significant disparity in street resurfacing and maintenance exists between the races. This disparity has not been rebutted by the City with any explanation, policy, or practice which could support a conclusion that it exists for any other reason other than race considerations.

60. Plaintiffs submitted similar evidence, as with street paving, of gross dis-

Explanation of modifications: ·

a. 1953 Resurfacing Program—Defendants argued that this program was only a request made to the state for resurfacing. Plaintiffs offered no testimony in opposition. The Court will thus omit it from its analysis.

b. 1956 Resurfacing Program—Defendants argued that E. Palm (3rd to West End) was not resurfaced and that Main Street (Truck Route to 5th Street) should have been included in the black residential column. The Court agrees with Defendants that E. Palm was not resurfaced. However, the Court finds that Main Street resurfacing was properly omitted from a list of streets resurfaced in the black residential area since it is listed in a commercial area. (*See,* Plfs.Ex. 2, Defendants' Additional Responses to Plaintiffs' Request for Admissions (First Set) and Interrogatories (Second Set)—Fact 462).

c. 1961 Resurfacing Program—Defendants argued that River from RR should be shifted from the white residential area to the black residential. The Court finds the street belongs in the white residential area. (*See, Ibid.,* Fact 77).

Defendants argued that two other streets: Main Street and Truck Route intersection and Main (Sumner to 7th) were black residential. The Court finds these streets were properly omitted as commercial. (*See, Ibid.,* Facts 462 and 52).

d. 1962 Resurfacing Program—Defendants did not contest the accuracy of Plaintiffs' Table.

e. 1964 Resurfacing Program—Defendants did not contest the accuracy of Plaintiffs' Table.

f. 1965 Resurfacing Program—Defendants argued that Main from Seaboard should have been listed as a street resurfaced in the black residential area. This street is omitted as it was not resurfaced but paved. (Ex. 5, Fact No. 94, ¶ 4).

g. 1966 Resurfacing Program—Defendants argue that E. Main (5th to 7th) should have been listed as a black residential street resurfaced. This is a commercial street and was properly omitted. (*See, Ibid.,* Fact 462).

h. 1967 Street Resurfacing Program—Defendants argue that Robinson (5th to 6th) was omitted from the list of black residential area streets resurfaced. The street was properly omitted as commercial. (*See, Ibid.,* Fact 478).

i. 1975 Resurfacing Program—Defendants argue that Sumner (5th to 6th); Sumner (6th to 7th) and Robinson (5th to 8th) were incorrectly omitted. Sumner (5th to 6th) is a black residential street and should be included. (*See, Ibid.,* Fact 444). However, Sumner (6th to 7th) and Robinson (5th to 8th) were properly omitted, as they are commercial. (*See, Ibid.,* Facts 465, 478).

j. 1976 Resurfacing Program—Defendants did not contest the facts.

k. 1977 Resurfacing Program—Defendants argued that 5th Street (Main to Utility) and 6th Street (Live Oak to Pineapple) should be added to the list of black streets. The Court finds that these streets were properly omitted as commercial streets. (*See, Ibid.,* Fact 472).

l. 1978 Resurfacing Program—Defendants correctly argued that 6th Street (Robinson to Madill) and 6th Street (Madill to Ross) should be included in black residential streets resurfaced. (*See, Ibid.,* Facts 75, 79). However, 5th Street (Main to Live Oak); 8th (Ross to Pineapple); 6th (Main to Ross); and 6th (Robinson to Church) were properly omitted because they are commercial. (*See, Ibid.,* Facts 476, 470, 473 and 472).

m. 1980 Street Resurfacing—Defendants argued that Pineapple (6th to 7th) and Main (7th to East End) should be included as black residential. The Court finds that these streets were properly omitted as commercial. (*See, Ibid.,* Facts 462 and 474).

n. 1982 Street Resurfacing Program—Defendants did not contest the facts.

parities between the races in storm water drainage facilities.[21] Facilities in the black community are unequal to those that exist in the white community. This evidence included: (1) a complete survey of all above ground storm water drainage facilities catalogued in the inventory of municipal services (Plfs. Ex. 1); information obtained from plaintiffs' request for admissions of fact and defendants' responses (Plfs. Ex. 2), (2) testimony of Fred Cooper.

61. A proper storm water drainage system serves two interrelated purposes. First, it acts to convey away water from one area to another after storm conditions. Second, it acts to preserve existing street paving by conveying water away from street surfaces and thus preventing deteri-

**21.** Similar conceptual defenses—racial identity of certain streets, commercial-or-residential characterization, those streets in recently annexed areas, and the state/county streets all resolved in the street paving discussion, *see, supra* ¶ 38–51, are all likewise rejected in consideration of the storm drainage disparities.

oration. (Testimony of F. Cooper), (Testimony of K. Barrett).

62. Drainage systems in Dade City consist of an underground system of piping and various above ground services. As to the underground system, City Engineer Barrett testified as to a fairly extensive system throughout the City's white residential community. In the entire black community, Barrett noted that the only underground system consisted of a small two block area on Sixth Street (Madill-to-Ross) and (Ross-to-Main).

63. The above ground storm water drainage facilities—catalogued in the inventory of municipal services (Plfs. Ex. 1), are reflected in the following summaries, and as with street paving, reflect an unmistakeable disparity in this service:

As with the street paving analysis, even if those streets within the 1982 annexed area were eliminated from the overall disparity analysis, a statistically significant disparity would still exist between the races in street paving services:

| CURRENT DRAINAGE CONDITIONS WITHOUT 1982 ANNEXATION (Households) | | |
|---|---|---|
| DRAINAGE DEVICE | WHITE RESIDENTIAL | BLACK RESIDENTIAL |
| No Drainage Device | 334 (25.5%) | 118 (35.2%) |
| Some Drainage Device | 974 (74.5%) | 217 (64.8%) |
| Totals | 1,308 (100%) | 335 (100%) |

| CURRENT DRAINAGE CONDITIONS WITHOUT 1982 ANNEXATION (Footage) | | |
|---|---|---|
| DRAINAGE DEVICE | WHITE RESIDENTIAL | BLACK RESIDENTIAL |
| No Drainage Device | 40,370 (28.3%) | 8,857 (38.0%) |
| Some Drainage Device | 102,026 (71.7%) | 14,486 (62.0%) |
| Totals | 142,396 (100%) | 23,343 (100%) |

These calculations have been made in the same manner as the street paving calculations.

*See, supra,* ¶ 45, n. 14.

CONCLUSIONS—DRAINAGE DEVICES

| CURRENT STATUS OF DRAINAGE DEVICES BY RACE (Footage) | | |
|---|---|---|
| DRAINAGE DEVICE | WHITE RESIDENTIAL | BLACK RESIDENTIAL |
| No Drainage Device | 40,370 (28.3%) | 14,571 (50.1%) |
| Ditches | 6,255 ( 4.4%) | 0 (0%) |
| Inverted Crown | 2,280 ( 1.6%) | 1,615 ( 5.6%) |
| Curb | 43,407 (30.5%) | 1,807 ( 6.4%) |
| Miami Curb | 50,084 (35.2%) | 11,001 (37.9%) |
| Curb/Miami Curb/with Catch Basins | (14,147)( 9.9%) | (1,215)( 4.2%) |
| Miami Curb with Ditches | (625)( .4%) | 0 (0%) |
| TOTALS | 142,396 ( 100%) | 29,057 (100%) |

Source: (Plfs. Ex. 4, Tab 1, Table I).

SUMMARY OF CURRENT STATUS

| SUMMARY OF DRAINAGE DEVICES BY RACE (Footage) | | |
|---|---|---|
| DRAINAGE DEVICE | WHITE RESIDENTIAL | BLACK RESIDENTIAL |
| No Drainage Device | 40,370 (28.3%) | 14,571 (50.1%) |
| Some Drainage Device | 102,026 (71.7%) | 14,486 (49.9%) |
| Totals | 142,396 (100%) | 29,057 (100%) |

Source: (*Ibid.*, Table II).

CONCLUSIONS—DRAINAGE DEVICES

| CURRENT STATUS OF DRAINAGE DEVICES BY RACE (Households) | | |
|---|---|---|
| DRAINAGE DEVICE | WHITE RESIDEN-TIAL | BLACK RESIDEN-TIAL |
| No Drainage Device | 334 (25.0%) | 217 (50.0%) |
| Ditches | 39 ( 3.0%) | 0 (0%) |
| Inverted Crown | 18 ( 1.4%) | 38 ( 8.7%) |
| Curb | 466 (35.6%) | 31 ( 7.2%) |
| Miami Curb | 451 (34.0%) | 148 (34.1%) |
| Curb/Miami Curb/with Catch Basins | (130)( 9.9%) | (28)( 6.4%) |
| Miami Curb with Ditches | (4)( .3%) | 0 (0%) |
| TOTALS | 1,308 ( 100%) | 434 (100%) |

Source: (*Ibid.*, Table III).

SUMMARY
Of Current Status

| SUMMARY OF DRAINAGE DEVICES BY RACE (Households) | | |
|---|---|---|
| DRAINAGE DEVICE | WHITE RESIDENTIAL | BLACK RESIDENTIAL |
| No Drainage Device | 334 (25.5%) | 217 (50.0%) |
| Some Drainage Device | 974 (74.5%) | 217 (50.0%) |
| Totals | 1,308 (100%) | 434 (100%) |

Source: (*Ibid.*, Table IV).

64. In sum, racial discrimination in storm water drainage facilities exists both in the underground as well as aboveground systems in Dade City. While the Court notes that the defendants' testimony describing various drainage problems in white residential areas may be completely credible, the Court finds the City's assertion that "no drainage problems exist in the black community" and/or the "black community just doesn't need more drainage" (Testimony of R. Barrett) as totally without merit and in direct conflict of the testimony of plaintiffs' expert, Fred Cooper, the various other black community witnesses, and in fact in conflict with observations of the defendants' own city manager and finance director.[22]

22. A more candid and realistic appraisal of the storm water drainage problems in the black community, than those testified to by the City Engineer, are documented *directly* from a Memorandum authorized by City Manager, Ben Bolan and Finance Director, Lindy Smith, to the City Commission.

In the Bolan-Smith Memorandum of April 6, 1982, those officials recommend various *drain-*

65. Plaintiffs contend that there was a factual causation relationship between the filing of the lawsuit by plaintiffs and capital improvements made in the black residential community which was the type of relief plaintiffs sought through a formal judicial decree. In considering this contention the Court will review the specific evidence of various improvements made throughout the black residential community since the filing of the lawsuit on February 23, 1981, and then, the Court will analyze both circumstantial and/or direct evidence of the interrelationship, if any, between the filing of the lawsuit and the various improvements.

66. The improvements made in the black residential community since the filing of the lawsuit as to each of the three challenged services are:

I. POST–FEBRUARY, 1981
STREET PAVING—
BLACK COMMUNITY

| Fact No. | Street | Location | House-holds | Foot-age | Source of Funds |
|---|---|---|---|---|---|
| 6 | Goodwin Ave. | 1st St. to Delmar St. | 2 | 325 | CDBG |
| 9 | Taylor Ave. | Delmar St. to Canal St. | 3 | 580 | CDBG |
| 14 | Canal St. | Taylor Ave. | 2 | 230 | CDBG |
| 16 | Canal St. | Tucker Ave. to Roosevelt | 3 | 640 | CDBG |
| 38 | Pond Ave. | 6th to 7th | 1 | 236 | CDBG |
| 46 | Sixth | Sumner to Pond | 3 | 440 | CDBG |
| 48 | Pond | 8th to Futch | 12 | 210 | CDBG |
| 49 | Pond | Futch to 10th | 3 | 230 | CDBG |
| 57 | Tenth | Whitehouse | 3 | 140 | CDBG |
| P | Wilson | Roosevelt to Hampton | 13 | 262 | County |
| Q | Wilson | Hampton to Tuskegee | 6 | 262 | County |

*age* and paving improvements, financed through a Community Development Trust Fund, to be made primarily in the black residential community. *See, infra,* ¶ 70, (list of specific improvements). In making the recommendation for such improvements the officials recognize the various drainage problems in the black community.

MEMORANDUM
TO: CITY COMMISSION
FROM: BEN BOLAN, CITY MANAGER, AND LINDY SMITH, FINANCE DIRECTOR
SUBJ: COMMUNITY DEVELOPMENT TRUST FUND—STATUS REPORT/RECOMMENDATIONS
DATE: April 6, 1982

| Fact No. | Street | Location | House-holds | Foot-age | Source of Funds |
|---|---|---|---|---|---|
| R | Wilson | Tuskegee to Sumner | 3 | 250 | County |
| | | Totals | 54 | 3,805 | |

(Plfs. Ex. 8, Tab 1)

II. POST–FEBRUARY, 1981
RESURFACING—
BLACK COMMUNITY

| Fact No. | Street | Location | House-holds | Foot-age | Source of Funds |
|---|---|---|---|---|---|
| 4 | Delmar | Erwin to Goodwin | 6 | 375 | CDBG |
| 7 | Delmar | Goodwin to Taylor | 5 | 300 | CDBG |
| 52 | Sumner | 7th to 8th | 4 | 350 | CDBG |
| 61 | Whitehouse | Futch to 8th | 5 | 225 | CDBG |
| | | Totals | 20 | 1,250 | |

Total Cost of Improvements (resurfacing) in the Black Community since February, 1981: $10,002.13.

(Plfs. Ex. 8, Tab 2)

III. POST–FEBRUARY, 1981
STORM WATER DRAINAGE—
BLACK COMMUNITY

| Fact No. | Street | Location | House-holds | Foot-age | Source of Funds |
|---|---|---|---|---|---|
| 6 | Goodwin Ave. | 1st St. to Delmar St. | 2 | 325 | CDBG |
| 9 | Taylor Ave. | Delmar St. to Canal St. | 3 | 580 | CDBG |
| 14 | Canal St. | Taylor Ave. | 2 | 230 | CDBG |
| 16 | Canal St. | Tucker Ave. to Roosevelt | 3 | 640 | CDBG |
| 38 | Pond Ave. | 6th to 7th | 1 | 236 | CDBG |
| 46 | Sixth | Sumner to Pond | 3 | 440 | CDBG |
| 48 | Pond | 8th to Futch | 12 | 210 | CDBG |
| 49 | Pond | Futch to 10th | 3 | 230 | CDBG |
| 57 | Tenth | Whitehouse | 3 | 140 | CDBG |
| P | Wilson | Roosevelt to Hampton | 13 | 262 | County |
| Q | Wilson | Hampton to Tuskegee | 6 | 262 | County |
| R | Wilson | Tuskegee to Sumner | 3 | 250 | County |
| | | Totals | 54 | 3,805 | |

The City has $140,000 + in Community Development Trust Funds, which is project income from the previously closed out HUD CDBG projects. On December 29, 1981, staff presented a concept to the Commission to utilize these monies for paving, drainage and street resurfacing in low and moderate income areas (see attached minutes). The streets selected were major throughfares or *drainage problem streets* where a street paving assessment program was highly unlikely. Paving major throughfares and *solving neighborhood drainage problems* benefit not only the immediate low/moderate income neighborhood, but also residents of the entire City and surrounding area. (emphasis in original)
(Plfs.Ex. 10, Tab 3)

Type of Storm Water Drainage Improvement:

"The majority of the streets constructed ... were designed to transport water along them with either Miami curbs or an inverted crown roadway section to a point where the storm water would drain to existing storm inlets, retention ponds, or drainage ditches."

Defendants' Answer to Interrogatory No. 3b (5)
(Eighth Set)
 1) CDBG
 2) County

[Source: Plfs. Ex. 8, Tab 3]

67. The direct relationship between the filing of the lawsuit and improvements made in the black community prior to trial is clearly established by the City attorneys' directive, in the form of a legal "opinion" to the Dade City commission:

### POSSIBLE IMPACT ON EXISTING LITIGATION

As the Commission is aware, the City is now being sued in the Federal Court for the Middle District of Florida, in the case of Ammons, et al. v. Dade City, Florida, Case No. 81–171–CIV–T–K. The City staff has recommended that federal funds now on hand be used to pave streets. Most of the streets to be paved are located in predominantly Black neighborhoods and their unpaved condition is part of the complaint brought by a group of Black citizens of Dade City. One of the main contentions of the suit is that the City has discriminated in paving the streets in the Black community and these parties are seeking to require the City to pave more streets in the Black community. Of course, we do not admit that the suit is well founded, but the result of litigation is never too certain. Therefore, it would certainly be to the advantage of the City in this litigation as well as to the citizenry as a whole to go ahead and pave additional streets in the Black community. Assuming, arguendo, that the City diverts the subject money to some other purpose, if the court decided the City should have paved the streets, we would not only have to pay for the paving of the streets out of the City tax revenues, but also would have to pay additional attorneys' fees and expenses in the pending action. In other words,

the granting of these funds to Trilby Manor could result in a great deal of additional expense to the taxpayers of Dade City not only in paving costs but in attorneys' fees and court costs.

For the reasons above stated, it is my legal opinion that the federal funds should not be transferred to Trilby Manor, but should rather be used to pave streets within the Black community as a proper public purpose.

Respectfully submitted,
GEORGE C. DAYTON
City Attorney

(Plfs. Ex. 10, Tab 1 and 2)

Corroborating this legal opinion, was a second memorandum authorized by city manager, Ben Bolan, and finance director, Lindy Smith, in which the following recommendation was made on April 6, 1982, as to the allocation of federal funds (Community Development Trust Funds) for the service improvements targeted in the black community and made after the filing of the lawsuit, as outlined in *supra,* ¶ 66:

### RECOMMENDATIONS

 * * * * * *

3. The proposed improvements will strengthen the City's position with regard to the Class Action Discrimination suit. Failure to use these monies to provide permanent public improvements in areas with minority representation could damage the City's case. (Plfs.Ex. 10, Tab 3)

68. Even had these direct written recommendations from the city attorney, manager and finance director not existed, it still appears obvious that when the improvement program made in the black community since April, 1981, see, *supra,* ¶ 66, is compared with the work done in the black community in years proceeding the lawsuit, compare *e.g.,* resurfacing in the black community 1956–1980, *supra,* ¶ 58, with resurfacing since 1981 in the black community were directly related to the filing of the lawsuit.

69. Thus, the Court finds that the post-April, 1981 capital improvements made in the black community were directly related to the filing of the lawsuit as evidenced by (1) the city attorney, manager and finance director's own written and unambiguous recommendation and (2) in light of the history and chronology of events evidencing few improvements made prior to the filing of the lawsuit and the post-filing activity in the black community.

70. Jurisdiction of plaintiffs' claims with respect to the individually named defendants—the mayor and councilmen—acting in their official capacities is conferred by 28 U.S.C. § 1331(a), 1343(3) and (4). *Johnson v. City of Arcadia,* 450 F.Supp. 1363, 1377 (M.D.Fla.1978); *Dowdell v. City of Apopka,* 511 F.Supp. 1375, 1382 (M.D. Fla.1981) *aff'd* 698 F.2d 1181 (11th Cir. 1983).

71. The Court has jurisdiction over the defendant, Dade City, pursuant to 28 U.S.C. § 1331(a) and 1343(3) and (4). *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and *Dowdell, supra,* 511 F.Supp. at 1382, 1383.

■ 72. Plaintiffs properly maintain their substantive cause of action under 42 U.S.C. § 1983 in this case involving allegations of violations of the Fourteenth Amendment to the United States Constitution, where such rights have been violated by public officials acting in their official capacities under "color of law." *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1967), *Johnson v. City of Arcadia, supra,* 450 F.Supp. at 1377.

73. Jurisdiction over plaintiffs' section 1983 claim is conferred pursuant to 28 U.S.C. § 1343(3) and (4). *Lynch v. Household Finance Corp.,* 405 U.S. 538, 543, n. 7, 92 S.Ct. 1113, 1117, n. 7, 31 L.Ed.2d 424, *Johnson v. Arcadia, supra,* 450 F.Supp. at 1377 and *Dowdell v. City of Apopka, supra,* 511 F.Supp. at 1383.

■ Revenue Sharing Act jurisdiction is conferred upon this Court by a showing that federal revenue sharing funds have been allocated to any "program or activity" whose practices have been challenged by a litigant. 31 U.S.C. § 1242(a)(1).

In its commentary to the Office of Revenue Sharing Regulations, 31 C.F.R. § 51.-51(i), 44 Fed.Reg. 19191, 19192 (April 2, 1979), it is noted that the agency has "consistently interpreted the term 'program or activity' to constitute the department or agency of the recipient government to which the federal funds were allocated for use." 44 Fed.Reg. at 19192 (April 2, 1979). Jurisdiction of ORS includes the entire department in which funds are used for a project and not limited to review of the individually funded expenditure. 44 Fed. Reg. 19191.

This regulation is consistent with judicial interpretation of the term "program or activity." Courts have defined this term to include the entire department or unit of government receiving Revenue Sharing funds, rather than the individual project upon which the recipient expended the funds. *See, United States v. City and County of San Francisco,* 20 FEP 179, 185 (N.D.Calif.1978), *United States v. State of New Jersey,* 473 F.Supp. 1199, 1208 (D.N.J. 1979), *United States v. City of Chicago,* 395 F.Supp. 329, 343 (N.D.Ill.1975).

Revenue Sharing funds have been allocated to street department activities which in turn confer jurisdiction over the City's street paving, resurfacing, and storm water drainage practices. *See,* (Plfs. Ex. 24, Attachment C) (City Revenue Sharing Expenditure).

Plaintiffs have indicated that they address the Revenue Sharing Act issues only for purposes of remedy, *see, infra,* page 1277 n. 1, as opposed to liability adjudication. The Court proceeds accordingly.

74. Prior to considering whether the disparities in municipal services furnished were constitutionally impermissible, the Court deems it appropriate to resolve as a matter of law two issues—raised in the context as defenses by the City. These defenses, discussed in order are: 1) special assessments, and 2) inclusion of the recently annexed black Larkins Subdivision in the disparity analysis.

75. The Court has found that the City's street paving assessment policy is infected with the following practices: First, approximately one-half (50.3%) of all residential paved streets were either never assessed at all or the assessment was never collected to the extent that at least 90% of the outstanding lien obligations were cancelled. *Supra,* ¶ 54.

These inconsistencies in the City's assessment policy—by neither assessing residential streets for paving at all or in cancelling the lien obligations of the assessments—reflect such an irregular and non-uniform practice as to eliminate any bar or defense to plaintiffs' constitutional claims. In making this conclusion, the Court notes that it is not writing on a clean slate as this identical issue has been resolved in plaintiffs' favor in another municipal services challenge brought in this District. *Dowdell v. City of Apopka, supra,* 511 F.Supp. at 1377 ("While some street paving has been accomplished through private front-footage assessments, there does not exist a consistent City policy to finance street paving from complete or even partial private resources.") *aff'd* 698 F.2d 1181 (11th Cir. 1983).

76. Second, the Court has found that the City's assessment practice has been racially discriminatory in that black citizens were required, when attempting to develop the major black Mickens-Harper Subdivision, to pay their assessment in advance of the paving which is contrary to City policy and never required in any white residential neighborhood. *Supra,* ¶ 60.

This practice in itself, distinguishes this action from *Hadnott v. City of Prattville, supra,* 309 F.Supp. at 970 where in holding that Prattville's uniform and non-racially discriminatory assessment policy was a bar to plaintiffs' constitutional challenge the court found that:

There is no evidence from which this Court can conclude that, in the location and construction of street paving in the City of Prattville, the City authorities have followed any pattern of discriminating against Negro residents by reason of their race or color.

77. For these reasons, that Court finds as a matter of law, that city's assessment practice: (i) non-uniform in nature in that many paved streets were never assessed at all, (ii) liens which were frequently not collected, and (iii) an assessment policy which was applied in a racially discriminatory manner in the context of the Mickens-Harper Subdivision—presents no bar or defense to plaintiffs' constitutional claims.

78. It is well settled that throughout the years and presently the "legislature is entitled to annex an area with or without an affirmative vote of the affected property owners." *North Ridge General Hospital v. City of Oakland Park,* 374 So.2d 461, 465 (1979) citing *State ex rel. Davis v. City of Clearwater,* 106 Fla. 761, 139 So. 377 (1932), *State v. City of Miami,* 103 Fla. 54, 137 So. 261 (1930), and *Nabb v. Andreau,* 89 Fla. 414, 104 So. 591 (1925). *See also, Capella v. City of Gainesville,* 377 So.2d 658, 661 (1979) (legislative annexation without referendum) and cases cited therein.

79. Annexation through legislative prerogative can occur simply by initiative of the appropriate local jurisdictions' legislative delegations sponsoring a bill and then ultimate passage by the state legislature. Article VIII, § 2(c) Fla.Const. *See, North Ridge General Hospital v. City of Oakland Park, supra,* 374 So.2d at 464, n. 4.

This option, available to the municipality throughout the years, was never acted upon by the City.[23] Having actively en-

---

23. The elements essential to constitute sound legislative annexation are all present, and were throughout the years in the Larkins Subdivision. *See, e.g. State v. Town of Boynton Beach,* 177 So. 327 (1937) (sufficient population so that services would benefit area); *Johnson v. Town of Suwannee River,* 336 So.2d 122, 124 (1st D.C.A.

1976) (area to be incorporated must be "suited for municipal purposes and must bear a just proportion to the population included."); *State ex rel. Davis v. City of Stuart,* 120 So. 335 (1929) (sufficient "community of interest" should exist between the annexed and annexing areas.)

couraged and indeed shared in the expenses for paving of new white residential subdivisions, *supra*, ¶ 24; participated in a series of recent annexations of areas within the present white residential community, (Defs.Ex. 2) (Map showing annexations since 1959), see, *Dowdell v. City of Apopka*, 698 F.2d 1181, 1186 (11th Cir.1983) (history of racial discrimination included—development and serving of new recently annexed white residential areas while black community remains unserviced.); and in light of the fact that the recently annexed Larkins Subdivision has (i) functioned as an integral part of the City and black community for at least thirty years, *supra*, ¶ 42–45; (ii) that a plain view of a City map reflects that it is contiguous with the City limits (Plfs.Ex. 20, 21) (Maps), and that (iii) given its overall dense population, the Court finds that the relationship between the Larkins Subdivision and the City is sufficient to constitute part of the black community of the City.

■ 80. The Court now proceeds with its constitutional inquiry in determining whether the disparities in the three contested services are constitutionally impermissible since otherwise neutral state action does not necessarily violate the fourteenth amendment equal protection clause solely because it has a disproportionate impact on a racial minority. Instead, courts must "adhere to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).

81. In assessing what type and how much evidence is required to establish proof of a discriminatory intent, the following substantive and evidentiary factors have been articulated by the courts. Evidence supporting each factor must be considered by the trier of this case in fulfill-

ment of its duty to make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 255, 266, 97 S.Ct. 555, 558, 563, 50 L.Ed.2d 450 (1976).

■ These factors, probative of discriminatory intent include: (1) the nature and magnitude of the disparity itself (discriminatory impact); (2) foreseeability of the consequences of the City's actions; (3) legislative and administrative history of the decision-making process; and (4) knowledge, in that a defendant's actions would be known to have caused the disparity or discriminatory impact which resulted from their conduct. See, generally, *Dowell v. City of Apopka*, supra, 698 F.2d at 1186.

■ 82. In consideration of these four factors, several other concepts rooted in civil rights jurisprudence are to be considered. First, a claimant need not prove that a racial purpose was the sole, dominant, or even the primary purpose for a challenged action, but only that it "has been a motivating factor in the decision." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, supra, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450. Discriminatory intent is "simply not amenable to calibration. It either is a factor that has influenced a legislative choice or it is not." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 277, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979).[24] Second, proof of subjective personal bias, motive or ill-will are irrelevant to the inquiry of whether intentional discrimination exists. *Dowdell v. City of Apopka*, supra, 698 F.2d at 1186, citing, *Palmer v. Thompson*, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971). Third, proof of intentional discrimination can be, indeed as it often is, developed through circumstantial rather than direct evidence. See, e.g.,

---

**24.** In the context of an identical action, the Eleventh Circuit, in *Dowdell v. City of Apopka, supra*, 698 F.2d at 1185, recently recognized: Neither does it require proof that racial discrimination is the sole purpose, *McGinnis v. Royster*, 410 U.S. 263, 276–77, 93 S.Ct. 1055, 1062, 35 L.Ed.2d 282 (1973), behind each failure to equalize these services. It is rather, the cumulative evidence of action and inaction which objectively manifests discriminatory intent. (citations omitted).

*Washington v. Davis, supra,* 426 U.S. at 241, 96 S.Ct. at 2048: (This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute...."), *Keyes v. School District No. 1, Denver Colorado,* 413 U.S. 189, 233, 93 S.Ct. 2686, 2709, 37 L.Ed.2d 548 (Powell, J., concurring in part and dissenting in part) ("The intractable problems [of proving intent] involved in litigating this issue are obvious to any lawyer. The results of litigation—often arrived at subjectively by a court endeavoring to ascertain the subjective intent of school activities ... will be fortuitous, unpredictable and even capricious."), and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp., supra,* 429 U.S. at 266, 97 S.Ct. at 563 (1977).[25]

■ 83. In proving discriminatory intent: "The impact of the official action—whether it 'bears more heavily on one race than another,' *Washington v. Davis, supra,* 426 U.S. at 242 [96 S.Ct. at 2048] (1976)," ("[W]hen the disproportion is ... dramatic ... it really does not matter whether the standard is phrased in terms of purpose or effect.") *Id.,* at 254, 96 S.Ct. at 2054; *Village of Arlington Heights v. Metropolitan Housing Authority, supra,* 429 U.S. at 266, 97 S.Ct. at 563 (1976); and *City of Mobile v. Bolden,* 446 U.S. 55, 70, 100 S.Ct. 1490, 1501, 64 L.Ed.2d 47 (1980), is the starting point.

■ 84. While an official act is not necessarily unconstitutional solely because it has a racially disproportionate impact, *Washington v. Davis, supra,* 426 U.S. at 239, 96 S.Ct. at 2047 (1976) and *Arlington Heights v. Metropolitan Housing Corp.,*

*supra,* 429 U.S. at 264–65, 97 S.Ct. at 562–63 (1977), it has been recognized that discriminatory impact "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Washington v. Davis, supra,* 426 U.S. at 242, 96 S.Ct. at 2048. *See also, Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. at 564 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action when the governing legislation appears neutral on its fact."), and *United States v. Texas Ed. Agency,* 579 F.2d 910, 914 (5th Cir.1978) ("The most effective way to determine whether a body intended to discriminate is to look at what it has done.")

■ 85. Discriminatory impact standing alone does give "rise to an inference of discriminatory intent" *Dowdell v. City of Apopka, supra,* 511 F.Supp. at 1383, *aff'd* at 698 F.2d at 1186, *citing Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

This conclusion, that the disparity in services alone gives rise to an inference of discriminatory intent is based upon the: (1) size of the disparity, and (2) the nature of the practices at issue in this case. Plaintiffs do not challenge any decision of Dade City to pave, resurface, or install drainage on a single street in the white community rather than black community. In such a situation there may very well be valid policy considerations which are part of the decision-making process dictating the paving of the single white street. *See, e.g., City of Memphis v. Greene,* 451 U.S. 100,

---

**25.** Rule 404(b) of the Federal Rules of Evidence provides some guidance on the type of evidence which can be used to prove intent and motive. It states that evidence of other crimes, wrongs, or acts are admissible for "proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident." Such evidence, however, cannot be used to prove that a specific act was performed. The existence of other bad acts or wrongs can however, be used as circumstantial evidence for determining the intent or motive with which a defendant acted.

In all other areas of the law, evidence of the sort offered here would be far more than necessary to support the judgment. The rule on sufficiency of the evidence should be no different in this case. *Compare FPC v. Florida Power & Light,* 404 U.S. 453, 468–69, 92 S.Ct. 637, 646, 30 L.Ed.2d 600 (1972); *Michalic v. Cleveland Tankers,* 364 U.S. 325, 330, 81 S.Ct. 6, 10, 5 L.Ed.2d 20 (1960); *Rogers v. Missouri Pac. R. Co.,* 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 449 n. 17, 1 L.Ed.2d 493 (1957). ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.")

101 S.Ct. 1584, 67 L.Ed.2d 769 (1981) (Closing of a single white street leading to black community does not rise to a constitutional violation.) In contrast, plaintiffs challenge successive decisions of the City over the years which resulted in the disparities described herein. *See, Castaneda v. Partida, supra,* 420 U.S. at 494, n. 13, 97 S.Ct. at 1280, n. 13 ("Disparity ... sufficiently large" over a period of time makes it "unlikely that it [was] [due] solely to chance or accident.").[26]

■ 86. The Supreme Court has recognized that discriminatory purpose can be shown by proof that the discriminatory impact is the reasonably foreseeable consequence of the challenged action. Thus, evidence of "actions having foreseeable and anticipated dispartate impact is relevant to prove the ultimate fact, forbidden purpose," and adherence to a challenged action with knowledge of the predictable effect is one factor, among others, which may be considered in determining purpose. *Columbus Board of Educ. v. Penick,* 443 U.S. 449, 464–65, 99 S.Ct. 2941, 2949–50, 61 L.Ed.2d 666 (1979). *See also, United States v. Texas Ed. Agency, (Austin Ill),* 564 F.2d 162, 168 (5th Cir.1977). The principle, that an actor is held to intend the "reasonable foreseeable results of his actions" is firmly rooted in the common law of torts. *See,* W. Prosser, *The Law of Torts,* § 8 (4th Ed.1971); *Restatement (Second) of Torts,* § 8A, Comment B, (1965). *See also, Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961) (42 U.S.C. § 1983 constitutionally based claims "should be read against the background of tort liability that makes a man responsible for the natural consequences of his act").

87. Here, the systematic allocation of greater resources, most graphically documented with street resurfacing expenditures; *supra,* ¶ 62, but equally applicable to the other services led to the foreseeable outcome of a deprived black residential community. *See, Dowdell v. City of Apopka, supra,* 698 F.2d at 1186.

88. The proper way to analyze the causes of current racial disparities is to trace the history thereof from "root" to "branch," *cf. Green v. County School Bd.,* 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968)—the only logical way to evaluate the growth of anything. This analytical approach is no more than recognition of the plain facts that "present events have roots in the past," *United States v. Oregon State Med. Soc.,* 343 U.S. 326, 332, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952), and that past conduct is significant because "it illuminates or explains the present and predicts the shape of things to come." *Id.* at 333, 72 S.Ct. at 695. *Accord, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1415–16, 8 L.Ed.2d 777 (1962); *Standard Oil Co. v. United States,* 221 U.S. 1, 75–77, 31 S.Ct. 502, 522, 55 L.Ed. 619 (1911); *Kansas City Star Co. v. United States,* 240 F.2d 643, 650–51 (8th Cir.1950). In *Keyes v. School Dist. No. 1 of Denver,*

---

**26.** For other decisions where disparate racial impact was found so compelling that inference of intentional discrimination was found, *see, Flores v. Pierce,* 617 F.2d 1386, 1389 (9th Cir. 1980), (Pattern of denying liquor licenses only to minorities); *Harkless v. Sweeny Independent School District,* 554 F.2d 1353, 1357 (5th Cir. 1977) (Vast majority of black school teachers' contracts not reviewed when a dual school system was integrated); *Resident Advisory Board v. Rizzo,* 564 F.2d 126 (3rd Cir.1977) (Disparate impact found in housing discrimination case where housing project that was being blocked had a waiting list composed of a 95% majority of non-whites); *U.S. v. Texas Education Agency,* 564 F.2d 162, 171 (5th Cir.1977) (*Austin III*) *on remand from* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1977); *petition for rehearing denied,* 579 F.2d 910 (5th Cir.1978) (en banc), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (Statistical evidence of student assignment reflecting segregation in school case); *Reed v. Rhodes,* 607 F.2d 714, 724 (6th Cir.1979) (Race of faculty of school correlated with race of students was accepted as statistical evidence indicating intent to discriminate); *Armstrong v. Brennan,* 539 F.2d 625, 637 (7th Cir.1976) (Statistical evidence showing racial imbalance in school system); *Meyer v. Missouri State Highway Commission,* 567 F.2d 804, 810 (8th Cir. 1977) (Statistical evidence in employment discrimination) *Detroit Police Officers' Association v. Young,* 608 F.2d 671, 687 (8th Cir.1979) (Disparity between white and black police was "significant" and that "standing alone evidenced intentional discrimination.").

413 U.S. 189, 210–11, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548 (1973), the Supreme Court confirmed the obvious relevance of this analytical principle to segregation cases. Referring to *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1283–84, 28 L.Ed.2d 554 (1971), the *Keyes* court said (413 U.S. at 211, 93 S.Ct. at 2698):

> We made it clear, however, that a connection between past segregative acts and present segregation may be present even when not apparent and that close examination is required before concluding that the connection does not exist. Intentional school segregation in the past may have been a factor in creating a natural environment for the growth of further segregation.

*See also, Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 465 n. 13, 99 S.Ct. 2941, 2950 n. 13, 61 L.Ed.2d 666 (1979).

Furthermore, in evaluating specific events for evidence of intentional discrimination, "[t]he historical background of the decision is one [relevant] evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp., supra*, 429 U.S. at 267, 97 S.Ct. at 564 (1977). This factor is based upon familiar tort principles that inferences may be drawn from evidence of "similar transactions and happenings." McCormick, *Evidence* § 164 (1954 ed.). *See, Dowdell v. City of Apopka, supra* 698 F.2d at 1186 and *Brown v. Bd. of School Commrs. of Mobile County, Ala.*, 706 F.2d 1103 (11th Cir.1983). (Legislative history surrounding passage of 1876 statute conclusive in proving intentional discrimination) (invalidation of county school board's at-large election system).

■ 89. The Court finds that the legislative and administration history of racial discrimination in general and in the allocation and distribution of the contested municipal services in particular is clear and persuasive.

Proof of knowledge is additionally present and supports the Court's findings of intentional discrimination.

The late Judge Scott's findings in *Dowdell v. City of Apopka, supra*, 511 F.Supp. at 1383, apply equally here:

> That their actions [City's] would result in a discriminatory impact on the residents of the black community was not unknown to defendants. A brief visit to the black community makes obvious the need for street paving and storm water drainage control. (Brackets added)

■ Although none of these factors are necessarily "independently conclusive" *Dowdell v. City of Apopka, supra*, 698 F.2d at 1186, the "totality of the relevant facts," *Washington v. Davis, supra*, supports this Court's findings that defendants and their predecessors have engaged in a course of conduct which inescapably evidences discriminatory intent and which is the cause and reason for the present disparity in (1) street paving, (2) street resurfacing, and (3) storm water drainage services.[27]

90. The Court has factually determined that in light of (1) Dade City's own documents authored by its attorney, city manager and financial director, *supra*, § 70–71, and (2) the history and chronology of

---

**27.** The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race. *McLaughlin v. Florida*, 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). The familiar principles of "strict scrutiny" apply here. The utilization of race is a suspect classification which triggers the most vigorous judicial scrutiny. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

A violation of the Equal Protection Clause is established unless the defendants can justify their conduct as "necessary to promote a compelling governmental interest." *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). Plaintiffs prima facie case has been proven under their constitutional claim. The Court has reviewed every plausible defense in a search for compelling state interest, "carefully and meticulously" *Reynolds v. Sims*, 377 U.S. 533, 561–62, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964), and concludes that defendants have not justified their conduct under this test.

events evidencing few improvements made prior to the lawsuit and the "bevy of activity" in the black community after filing of the action, *supra*, § 72, that a factual causal relationship between the filing of the lawsuit and relief obtained is manifestly clear.

91. As a matter of law and based upon findings of fact herein, the Court concludes that the filing of plaintiffs' lawsuit was the "significant factor or substantial catalyst" for improvements made in the black community after filing of the lawsuit.

92. In making this determination the Court applies the two existing catalyst standards which have emerged within the Eleventh-Fifth Circuits and the other courts of appeal.

In application of the first standard, the inquiry focuses upon a demonstration of the "causal relationship between the lawsuit and relief obtained." *See, Robinson v. Kimbrough*, 652 F.2d 458, 465–67, (5th Cir. 1981), *withdrawing and vacating* 620 F.2d 468 (5th Cir.1980) (catalyst exists where lawsuit was "a substantial factor or a significant catalyst in motivating the defendants to end their [challenged] behavior") *supra*, 652 F.2d at 466; *Iranian Students Association v. Edwards*, 604 F.2d 352, 353 (5th Cir.1979); and *Criterion Club of Albany v. Board of Commissioners of Dougherty County*, 594 F.2d 118, 120 (5th Cir. 1979). Plaintiffs satisfy this test.

Even under the more demanding second standard adopted in the First, Seventh, Eighth, and Tenth Circuits,[28] plaintiffs fulfilled that test in proving that (1) the lawsuit was causally related to the achievement of the relief obtained, and (2) that plaintiffs' claims were not frivolous, unreasonable, or groundless.

 93. Generally, while acting as a federal chancellor in formulating a remedy to cure constitutional violations, the Court is governed by the general rule that an equity court must shape its decree so as to secure "complete justice," *Albemarle Paper v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

94. Within the context of general equitable principles, the Eleventh Circuit has recently affirmed a two-step remedy plan in actions such as this, which provides for (1) enjoining a municipality from "initiating or constructing any new municipal services or improvements in the white community until such time as the disparities in the black community facilities [sic] were eliminated and (2) impounding all of the city's federal revenue sharing funds with the stipulation that they be used only to pay for capital improvements in the municipal services provided to the residents of the black community." *Dowdell v. City of Apopka*, *supra*, 698 F.2d at 1184, *affirming*, *supra*, 511 F.Supp. at 1384. *See also, Johnson v. City of Arcadia*, *supra*, 450 F.Supp. at 1380, ¶ 5–6.

95. In application of these principles the Court recognizes that plaintiffs are entitled to "actual and complete equality in the receipt of municipal services" from Dade City. *Dowdell v. City of Apopka*, *supra*, 511 F.Supp. at 1384.

 96. The Court has jurisdiction over the City's federal revenue sharing funds for purposes of implementing a full remedy plan, *see, supra*, ¶ 78, and has power to escrow the City's federal revenue sharing funds to insure complete relief in cases of this nature, *Johnson v. City of Arcadia*, *supra*, 450 F.Supp. at 1380, ¶ 6. However, the Court is aware that many improvements have been implemented in the black community since the April 1981 filing of this lawsuit.

---

28. *Nadeau v. Helgemoe*, 581 F.2d 275, 281 (1st Cir.1978); *Harrington v. DeVito*, 656 F.2d 264, 267–68 (7th Cir.1981); *United Handicapped Federation v. Andre*, 622 F.2d 342, 346–47 (8th Cir. 1980) and *Gurule v. Wilson*, 635 F.2d 782, 792 (10th Cir.1980).

While it is not entirely clear, it appears that the Eleventh Circuit has adopted the first standard. *Doe v. Busbee*, 684 F.2d 1375, 1379–80 (11th Cir.1982). For a discussion involving the interrelationship of these two standards, *see, Johnston v. Lago*, 691 F.2d 283, 285–86 (6th Cir.1982), and *Long v. Bonnes*, 455 U.S. 961, 962–967, 102 S.Ct. 1476–1479, 71 L.Ed.2d 681 (1982), *dissenting from denial of cert.* (Rehnquist, J.).

97. In addition, it appears that the City has taken some steps since the filing of the lawsuit to begin to eliminate racial discrimination in the provision of various City services. Therefore, the Court will not at this time escrow the City's federal revenue sharing funds.

98. The ultimate relief to which plaintiffs are entitled is, of course, actual and complete equality in the receipt of municipal services from the City of Dade City. The municipal services available to the residents of the black community should be on par with, and entirely equal to, the municipal services and facilities available to residents of the white sections of town. The first step in reaching this goal is the elimination of the effects of past discrimination in the provision of municipal services. The Court, however, is neither in a position, nor of the inclination, to order defendants to institute specific programs or construct specific facilities or projects. The exact manner in which the conditions caused by defendants' constitutional and statutory violations will be remedied is better left to those who are more fully versed in engineering and building construction. This is not to say, however, that the Court is evading its responsibilities to plaintiffs. An injunction will be issued against defendants, prohibiting their spending of any funds on the construction or improvement of municipal services in the white community until such time as the street paving, resurfacing and storm water drainage systems in the black community are on par with that of the white sections.[29]

99. Finally, as the prevailing party, plaintiffs are entitled pursuant to the Civil Rights Attorney Fees Awards Act of 1976, 42 U.S.C. § 1988, to an award of attorney fees and litigation expense reimbursement as the "catalyst" and for prevailing party at trial.

Plaintiffs shall file with the Court within twenty (20) days from the issuance of the Court's Final Judgment appropriate fee/expense submissions and accompanying memoranda as to this issue. Defendants shall respond within thirty (30) days from plaintiffs' filing.

100. Jurisdiction will be retained over this cause to assure that plaintiffs' rights are fully protected and vindicated.

## FINAL JUDGMENT

For the reasons set forth in the Court's opinion of this date, it is now

ORDERED, ADJUDGED and DECREED:

1. This judgment extends to all issues set forth in the complaint as filed in this matter and to the class of plaintiffs defined as:

> All black residents of Dade City, Florida, who have been affected by defendants' policy or practice of racial discrimination in the providing or financing of various municipal services.

2. This Court has jurisdiction of the subject matter of this action and the parties thereto.

3. Defendants are declared to have violated plaintiffs' rights under the Fourteenth Amendment to the Constitution of the United States with respect to providing street paving, street resurfacing and maintenance, and storm water drainage facilities.

4. Defendants are enjoined from providing these municipal services in a racially discriminatory manner in violation of the Fourteenth Amendment of the Constitution of the United States.

5. Defendants are enjoined from initiating or constructing any new municipal services or improvements in the white residential community (as defined by this Court) until such time as the street paving, street resurfacing and maintenance, and storm water drainage facilities in the black community are on par with that which is available in the white residential area. This does not prevent the City of Dade City, Florida from performing customary and

---

**29.** Based on Judge Scott's order in *Dowdell v. City of Apopka,* 511 F.Supp. 1375, 1984 (M.D. Fla.1981).

regular maintenance work, other than street resurfacing in the white residential community, for its services and facilities, both in the white and black residential neighborhoods.

6. Within forty-five (45) days of the date of this judgment, defendants shall submit to the Court, with copies to counsel for plaintiffs, a plan for the construction of and improvements to the municipal services described in paragraph 3 above, which plan shall have the specific goal of remedying the disparity between the availability of these services and facilities in the black community and those available to the white residents of Dade City. The plan shall detail the construction to be done including engineering design, the cost of each project, and the estimated time to completion. The plan shall specifically incorporate and address those directives of the Court outlined in the Court's findings of fact and conclusions of law at ¶ 98.

Plaintiffs shall then submit, if they deem appropriate, within thirty (30) days any reply to defendants' plan.

7. Jurisdiction of this cause is retained for the entry of such further and other orders as may be necessary or required to facilitate the execution of this final judgment.